RAMEY LUMBER CO., Limited, v. JOHN SCHROEDER LUMBER CO.

(Circuit Court of Appeals, Seventh Circuit. June 15, 1916. Rehearing Denied October 3, 1916.)

No. 2307.

1. CONTRACTS ⟨⇒⟩9(1), 10(4)—VALIDITY—CERTAINTY—MUTUALITY.

A contract by a company, which owned and operated a sawmill and also bought lumber from other mills, to sell all the lumber of certain grades it should "manufacture or own" during the season, is not void for uncertainty as to the quantity sold nor for lack of mutuality.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 10–15, 17, 19, 20, 37; Dec. Dig. ⟨⇒⟩9(1), 10(4).]

2. CONTRACTS ⟨⇒⟩9(1)—VALIDITY—CERTAINTY.

If the intention of a contract be clear, the mere uncertainty of the amount involved does not invalidate it.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 10–15, 17, 19, 20; Dec. Dig. ⟨⇒⟩9(1).]

In Error to the District Court of the United States for the Eastern District of Wisconsin.

Action at law by the Ramey Lumber Company, Limited, against the John Schroeder Lumber Company. Judgment for defendant, and plaintiff brings error. Reversed.

In June, 1910, plaintiff in error, herein termed "plaintiff," and defendant in error, herein termed "defendant," entered into a written contract signed by the plaintiff, and, on behalf of defendant, by one J. McCauley, manager of the Chicago branch of the defendant's business. This contract involved a large amount of lumber, something over 1,000,000 feet, and was fully executed. In November, 1910, plaintiff wrote defendant:

"In the matter of next season's stock from this and adjoining localities it begins to look as if there could be considerable of the better grade secured as we have investigated the situation some and from the present outlook there will be a fair amount produced by the various small mills.

"The mills that we have in mind will have as good lumber as our own, and it will be well manufactured and properly handled and with our assistance it should prove very satisfactory.

"Since this subject has been mentioned to you we conclude that the manner of handling this for you will be agreeable to both interests as we feel that your interests can be protected as to quality and grade and the cost will be a minimum base.

"We would like very much to be taken into consideration when you give this section attention and this will include the better stocks on the Clearwater as we are now considering the stock from one of the best mills over there and one that cuts the same stock as ours.

---

⟨⇒⟩For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

"This arrangement looks to us as if it will yield us a fair margin and save you much expense in the handling of sundry stocks that you might secure."

To this defendant replied on November 17, 1910:

"Your favor of the 4th received and contents carefully noted.

"As advised your Mr. Spencer, we will be in the market next season for all of the factory pine of a certain type and character that we can get hold of at a reasonable market value. We see no reason why we could not handle a percentage, if not all, of the available stocks in your territory, and, as advised you personally, we expect to give you consideration along this line when we are contemplating making contracts for next season's cuts in your district."

On January 6, 1911, defendant wrote:

"Yours of the 30th received and contents carefully noted.

"We note that you will have at your own mill around two million feet and the contracts that you now control will give you an output of about three and one-half million feet for the season of 1911.

"It will not be our policy to send our men into your locality, or interfere with you at all, if you control that business and we control the outputs through you; that is, we want to arrange for a contract with you covering all the stock that you will manufacture and all of the stock that you will contract for. In this way it will give us the assurance that whatever stock you contract for we will control, and certainly we would not put our men in the same territory to buy stock in competition with you, when we have a contract with you to control all of the output. This would depend of course as to whether or not you would be able to control this output. In making such an arrangement with any one we expect to work in harmony with them, otherwise we would not want to contract with them at all.

"Now in reference to prices for product of 1911, we would prefer deferring price proposition until the writer visits the West, which will be within a few weeks. In this connection, we can afford to pay you as much as any one in the same kind of business that will pay you for your stock. You can appreciate that a small factory would pay you a higher value than we could, but you would have to give them the stock as they want it. We take the stock as you want to deliver it and pay you for it as loaded. As you state you have had offers along other lines, kindly advise us what you consider the values are for this season."

On January 24, 1911, plaintiff wrote the defendant as follows:

"Price would be $18.00 for the D and $30.00 for the C.

"As soon as the time arrives for you to take up the matter of thick shop lumber for the coming season we would be glad to hear from you as this subject is being agitated considerable now and we want to learn from some one about what we can depend upon for this coming year.

"We are logging as hard as possible and expect to put in a much larger cut than we did last season and our timber is running much better than last year."

On January 25, 1911, defendant, through McCauley, wrote:

"It is nearing the season for the contracting of factory plank in your district. Last year we had the matter up with you in reference to your company looking after what factory plank would be produced in your district for our account. Will you kindly advise if you are still contemplating purchasing factory plank in that district in excess of your own production. We prefer to have some one like ourselves in the territory to take care of the small contracts and would pay you a profit for handling rather than to contract for the outputs ourselves, providing we would not have to pay you too much for this service."

To this, plaintiff replied:

"We will have considerable shop lumber other than that we manufacture at our mill, possibly two million feet, as we have contracted with two or three small mills and are arranging for the cut of as many more for their cut of shop and we may have in all about 3½ millions this season, including our own.

"Of course if your policy is to send your own men into this locality and offer the same price as that you would pay us our opportunities would be very much curtailed but if you do not do this we feel that the greater por-

tion of the shop on this line as well as on the Clearwater line can be secured by us. This would have no reference to anything the Craig Mt. Lumber Co. produced.

"The better way in our opinion to handle this stock that we will have will be at a price f. o. b. loading point with all expenses included and we would pay you for the loading, shipping and grading. * * *

"It will be agreeable for us to represent you entirely in the above named districts provided this can be done without your men's interfering in any way other than with the exception above noted.

"Please indicate your best proposition as to prices covering our stock for this coming season and we can very soon advise you of our conclusions in the matter. * * *

"Please advise us promptly as to your conclusions regarding the manner of our handling this shop lumber in the districts named and also the best prices you care to offer us for the stock. * * * We will be glad to see your Mr. McCauley whenever he comes west and we hope his trip may be made soon."

On March 25, 1911, the contract was entered into between plaintiff and defendant, the latter acting through said McCauley, which contract was as follows:

"Memorandum of agreement entered into this 25th day of March, A. D. 1911, by and between Ramey Lumber Co., Ltd. (a corporation), of Vollmer, Idaho, party of the first part, and John Schroeder Lumber Co. (a corporation) of Milwaukee, Wis., party of the second part: Witnesseth, that in consideration of the covenants and promises made herein by the party of the second part the said first party hereby agrees to sell to said second party all the western pine shop lumber said first party will manufacture or own during the season of 1911, consisting of 5/4, 6/4 and 8/4 stock at the following prices loaded on cars in the rough:

"For 5/4 and 6/4 stock that will grade No. 3 $11.50 for No. 2 $17.00 for No. 1 $25.00 and for C. & better $32.00 and for 8/4 No. 3 $11.50 and for 8/4 No. 2 $19.00 and for 8/4 No. 1 $27.00 and for 8/4 C & better $34.00.

"Said first party agrees to grade and ship all the above named stock as soon as said stock is dry enough to ship without any additional expense to said second party.

"All the lumber sold under this agreement shall be manufactured in a workmanlike manner and inspected carefully in accord with the rules of the Northern Pine Manufacturers' Association and in the event that complaints are made as to the said grade then the said association's conclusions shall be final.

"All the above named lumber is to be loaded out as it comes from the piles, that is to say, that all lumber grading No. 3 and better to be loaded in same car as comes from the piles.

"Said second party agrees to purchase and receive the above named lumber as it is loaded by said first party and to pay therefor the above named prices in the following manner. By sight draft attached to each invoice for each car of lumber as shipped with bill of lading attached thereto. Less 2 per cent.

"The receipt of one dollar ($1.00) as a valuable consideration for the execution and delivery of this agreement is hereby admitted.

"In witness whereof the said parties hereto have set their hands and seals by their proper authorized agents this 25th day of March, A. D. 1911.

"Ramey Lumber Co., Ltd.,<br>
"By W. J. Ramey, Pres.<br>
"John Schroeder Lumber Co.,

"Witness: R. L. Spencer.         J. McCauley."

Defendant denies that it approved the contract, and denies McCauley's authority to execute it.

In pursuance of the contract, plaintiff, a manufacturer of lumber near Vollmer, Idaho, shipped to defendant, a dealer in lumber at Chicago and Milwaukee, to the address of Minnesota Transfer, 32 cars prior to August 1, 1911, which were accepted and paid for. Thereafter 20 cars were shipped

before receipt of request, but delivered after defendant had requested that shipments be delayed, and the defendant, on August 29, 1911, repudiated the contract. This suit was thereupon instituted and the cause submitted to the court without a jury. By the special finding of facts made at defendant's request it appears that plaintiff, prior to such repudiation, had manufactured, and had taken and received, lumber theretofore bought by it from the surrounding mills, until it had on hand, on and prior to August 29, 1911, 1,455,919 feet of lumber found by the court to comply with the contract specification, and 903,600 feet of rejected lumber, in addition to the amount covered by the 32 and 20 car shipments—or a total of 3,373,775 feet, besides certain Snyder lumber not inspected—all of which, plaintiff claims, except 7,500 feet, was applicable on the contract.

The court found as matter of fact that it was defendant's intention to sell the lumber in transit to avoid freight charges and handling expenses; that the lumber was shipped faster than defendant could resell the same to its customers; and that some part of the shipment of 32 cars became subject to demurrage and was by defendant reshipped to its Milwaukee yards, at an expense of several thousand dollars. The court further found that the 20 carloads rejected by the defendant were afterwards sold by the plaintiff, after using due diligence, for $2,351.97 less than the sum which should have been payable therefor under the contract, being $6.40 per thousand, on an average, less than the contract price, and that the lumber was up to grade; and that the remainder of the lumber was sold by the plaintiff between December 26, 1911, and July 18, 1912, at a heavy loss.

The court further found that western pine shop lumber of the grade specified in the contract between plaintiff and defendant, had, during the months of August and September, 1911, particularly on August 29, 1911, an established market value; that the market price of each of the several grades of lumber mentioned in the contract during that time was $1.75 per M less than the price specified in the contract on each such grade, and that the market prices remained the same as last above set forth up to July 1, 1912, increasing during the spring and summer of 1912; that western pine shop lumber such as that here in question should be manufactured during the months of March, April, May, June, and July of each year.

The total amount of lumber so manufactured and owned was largely in excess of the amount found by the court to be up to specifications on inspection. As to this, it is the contention of plaintiff that the blue disfiguration which led to its rejection had arisen since its manufacture, by reason of the delay in disposing of the same. On the other hand, it is in evidence that that lumber was not up to the specification of the contract at the time it was manufactured.

The court found as conclusions of law: (1) That defendant was estopped to deny the authority of McCauley to execute the contract in suit; (2) that said contract was void for want of certainty and mutuality as to all of the lumber for the season of 1911 owned by plaintiff, except the 32 carloads which were delivered and accepted, and dismissed the complaint.

Plaintiff assigns for error that the court held:

(1) The contract to be void for want of certainty and mutuality.

(2) That defendant was ignorant of conditions as to volume of lumber which plaintiff could produce.

(3) That certain of the lumber was not up to contract quality.

(4) That said lumber was being shipped too rapidly.

(5) That the difference between the contract price and the market price, when the lumber should have been taken, was only $1.75.

(6) That the lumber applicable on said contract, exclusive of the 52 cars shipped, was only 1,455,919 feet.

Other facts appear in the opinion.

Fred C. Ellis, of Milwaukee, Wis., for plaintiff in error.

Frank M. Hoyt and Alex. L. Strouse, both of Milwaukee, Wis., for defendant in error.

Before KOHLSAAT, MACK, and ALSCHULER, Circuit Judges.

ALSCHULER, Circuit Judge (after stating the facts as above). The District Court properly held that McCauley had authority to execute the contract. The sharp decline in the price of lumber seems to have been the only excuse for the suggestion. The correspondence appearing in the record, some of which we have recited, leaves no basis for this defense.

The lumber was on hand, owned by plaintiff, at the time of the repudiation of the contract, and ready to be delivered. Defendant had accepted a part thereof which was shipped to it July 31, 1911. On August 5, 1911, defendant directed all shipments to be made to it at Minnesota Transfer until further notice. On August 9, 1911, objection was made by letter to drafts made on the Chicago office instead of the Milwaukee office. On the same day further directions were given by mail as to shipments. On August 14, 1911, defendant wired to discontinue shipments until instructed. Plaintiff replied that to stop shipments would be a great damage to it. On August 16, 1911, defendant notified plaintiff it should assume all collection charges. August 16, 1911, defendant complained of the rush of cars of lumber, and renewed orders to stop shipments. On August 18th, further complaint was made on this score. Plaintiff replied to these requests that it did not receive notice in time, and that it had stopped, but complained that it would suffer injury therefrom. Then came a repudiation. It will be recalled that in the letter of January 6, 1911, the right to ship whenever ready was held out as an inducement, and the contract requires defendant to purchase, receive, and pay for the lumber so loaded. On September 8, 1911, defendant hints at the lack of authority of McCauley to execute the contract. We find in the record nothing to warrant the action of defendant in repudiating the contract. The plaintiff had this large amount of lumber on hand, and was anxious to avail itself of the opportunity to obtains cars before they would be required for grain shipment. So far as the record shows, it was in good faith carrying out its part of the contract.

[1] As to the defenses of uncertainty and want of mutuality, we are unable to concur in the decision of the trial court. The contract did not lack mutuality of obligation. While defendant promised to buy of plaintiff all the lumber of a certain quality that plaintiff might own during the season, plaintiff bound itself, if it did manufacture or acquire any such lumber, to sell all of it to defendant and to no one else. Thus plaintiff deprived itself of the right to sell lumber to whom it pleased. The promise to restrict its freedom by giving up its right to sell to others was real and definite. It was the substantial and contemplated consideration for defendant's promise to buy all that plaintiff might own during the season. There was the mutuality of obligation essential to a bilateral contract; there was the consideration essential to the validity of any contract. Conley Camera Co. v. Multiscope & Film Co., 216 Fed. 892, 133 C. C. A. 96; Burgess Sulphite Fiber Co. v. Broomfield, 180 Mass. 283, 62 N. E. 367. That the plaintiff did not bind itself to acquire or manufacture any such lumber is immaterial. Its promise to deal with defendant was the valid consideration for the obligation by defendant—a consideration that made the undertaking of the other party binding and enforceable.

[2] With regard to the question of uncertainty, a contract is void (save for the possibility of reformation in equity) because of uncertainty, only when it is so worded that the intention of the parties cannot be deduced therefrom. If the intention be clear, the mere uncertainty of the amount involved does not invalidate the obligation, however it may affect the possibility of proving damages for a breach. In the present case the preliminary negotiations demonstrate that defendant wanted to secure all such lumber that it could possibly obtain, without limit, and without binding plaintiff absolutely and under all circumstances to deliver any lumber. The parties had a right to make such a contract, even though the amount that would be deliverable thereunder was not specified, and was in a sense optional with the vendor; and this they did, in terms which are clear and certain.

The contract expresses without uncertainty the intention of obtaining all the lumber plaintiff might acquire and manufacture during that season. That plaintiff might take advantage of market conditions, and buy or refrain from buying heavily, was of the very essence of the agreement. Inasmuch as it gave a valuable consideration for this right, this case is distinguishable from Crane v. Crane, 105 Fed. 869, 45 C. C. A. 96; Tweedie Trading Co. v. Parlin & Orendorff Co., 204 Fed. 50, 122 C. C. A. 364; Oakland Motor Co. v. Indiana Automobile Co., 201 Fed. 499, 121 C. C. A. 319; and Velie Motor Car Co. v. Kopmeier Motor Car Co., 194 Fed. 324, 114 C. C. A. 284.

Moreover, there were definite limitations on the amount that could and must be tendered. While plaintiff had the option either to manufacture and to buy from others, or to refrain therefrom, it was absolutely obligated to sell all that it manufactured or owned during the season. When the contract was executed, the maximum amount that would be deliverable thereunder, while unknown to the parties, and in that sense uncertain, was, under the finding of facts, the amount of specific grades of a definite kind of lumber that could be manufactured between March and July of the year 1911 either by plaintiff or others. So much thereof as plaintiff might own within a definitely limited time, the season of 1911, was the amount that it had obligated itself to sell. This would necessarily have become certain during the season, even if the time limit for plaintiff's ownership included, not merely the manufacturing season, but also the short period thereafter within which delivery must be made.

No claim, however, is made for any lumber not owned by plaintiff prior to defendant's repudiation of the obligation. The amount then owned, and as to which, by reason of plaintiff's ownership, both parties were bound, the one to sell, the other to buy, was necessarily certain, and the amount of lumber, in respect to which damages are claimed, was thus definitely fixed at the date of defendant's repudiation.

We therefore conclude that the plaintiff is entitled to recover as its damages the loss it incurred from defendant's nonacceptance of the 20 carloads, and on account of the 1,455,919 feet on hand at time of repudiation of the contract. As to the 903,600 feet rejected as not grading up to contract, we conclude that the fact of its discoloration

warranted the finding that it never was of the grade deliverable under the contract, and that no damages are predicable thereon.

Plaintiff telegraphed defendant on September 18, 1911, as follows:

"Railroads insist upon disposition of the twenty cars immediately and unless you pay for them we will dispose of them to the best advantage possible, charging you with any loss in consequence and proceed to collect this loss from you through courts."

The 20 cars were shipped, as above stated, before plaintiff received notice not to ship, and were later delivered but rejected. In such case, the plaintiff might sell the 20 car lot and collect the loss from defendant, based on the difference between the selling and contract prices. The court found that plaintiff, after due notice, sold the 20 cars, and realized thereon $2,351.97 less than the contract price, and that plaintiff used due diligence in making the sale; and as to the 1,455,919 feet it found that, at the time of repudiation of the contract, its market price was $1.75 per M less than the contract price.

Giving to the findings of facts the weight properly accorded thereto, we find the recoverable loss to plaintiff through defendant's unjustified repudiation of the contract is, as to the 20 carloads, $2,351.97, with interest thereon at 6 per cent. per annum from August 29, 1911, and as to the 1,455,919 feet applicable on the contract, $1.75 per M, or $2,547.85, with interest thereon at same rate from November 17, 1914. The said sums, aggregating $4,899.82, together with interest as stated, under the facts as found, we find to be the amount for which the District Court should have entered judgment for the plaintiff.

The judgment is therefore reversed, and the cause remanded, with direction to the District Court to enter a judgment in favor of plaintiff for $4,899.82, together with interest as above stated to date of entry of judgment, and costs.