KENAN, McKAY & SPIER v. YORKVILLE COTTON OIL CO.

(Circuit Court of Appeals, Fourth Circuit. July 1, 1919.)

No. 1695.

SALES ⬅71(4)—CONTRACT FOR SALE OF SEASON'S PRODUCT—BREACH.

A contract by a cotton seed oil mill for the sale of its "season's output of linters, about 400 bales," *held* not violated by the closing of the mill before the end of the season for sufficient reasons not connected with the contract.

In Error to the District Court of the United States for the Western District of South Carolina, at Rock Hill; Charles A. Woods, Judge.

Action at law by Kenan, McKay & Spier, a corporation, against the Yorkville Cotton Oil Company. Judgment for defendant, and plaintiff brings error. Affirmed.

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

J. A. Marion, of York, S. C.; and Winfield·P. Jones, of Atlanta, Ga., for plaintiff in error.

John R. Hart and George W. S. Hart, both of York, for defendant in error.

Before PRITCHARD and KNAPP, Circuit Judges, and ROSE, District Judge.

KNAPP, Circuit Judge. Plaintiff in error, plaintiff below, a Georgia corporation, is a dealer in cotton linters. Defendant, a South Carolina corporation, is the owner of a cotton seed oil mill at Yorkville, in that state. In July, 1915, these parties entered into a contract whereby plaintiff bought and defendant sold its "season's output of cotton linters for season 1915–1916, about 400 bales," on terms specified. In this oil mill business the "season" is said to begin with August and end with the following July; but it appears that the period of active operations, during which most of the available seed is consumed, covers ordinarily only four or five months. Defendant started up its mill in September, and kept it running until the latter part of November, when it was closed down. In that time it produced 155 bales of linters, all of which were delivered to and paid for by plaintiff according to the contract. On the last invoice was indorsed the statement:

"On account of not being able to borrow money for operating purposes, our mill has been forced to close down for the season 1915–1916."

And under date of December 18th the defendant wrote:

"We have shipped you our entire output, and, should we resume operations this season, we will ship you any further linters we make. We have nothing to add to this, and from our standpoint it closes the matter."

In the following February plaintiff brought suit for breach of contract in the court of common pleas for York county, S. C. Upon the trial of the cause, and at the close of plaintiff's testimony, the court granted defendant's motion for a nonsuit, and this ruling was affirmed by the Supreme Court of the state in March, 1918. 96 S. E. 524, 1 A. L. R. 1387. Not long afterwards the present action was commenced to recover damages for breach of the same contract. In the court below a verdict was directed for defendant, and plaintiff comes here on writ of error.

There is little dispute about the ·facts, and the case turns on the construction of the contract. Plaintiff contends that it obligated defendant to operate its mill during the season named, and that raises the decisive question. It is well settled that such a contract as is here considered carries no guaranty that the estimated quantity will be delivered. The promise of the seller is not absolute. It is essentially a pledge of good faith; and so the courts have held. In Brawley v. United States, 96 U. S. 168, 171 (24 L. Ed. 622), a case frequently cited, it is said:

"Where a contract is made to sell or furnish certain goods identified by reference to independent circumstances, such as an entire lot deposited in a cer-

tain warehouse, or all that may be manufactured by the vendor in a certain establishment, or that may be shipped by his agent or correspondent in certain vessels, and the quantity is named with the qualification of 'about,' or 'more or less,' or words of like import, the contract applies to the specific lot; and the naming of the quantity is not regarded as in the nature of a warranty, but only as an estimate of the probable amount, in reference to which good faith is all that is required of the party making it."

Among numerous cases to the same effect are Pfann & Co. v. Lumber Co., 194 Fed. 71, 114 C. C. A. 89; Ramey Lumber Co. v. Schroeder Lumber Co., 237 Fed. 39, 150 C. C. A. 241; Wemple v. Stewart, 22 Barb. (N. Y.) 154; Drake v. Vorse, 52 Iowa, 417, 3 N. W. 465; McKeever, Cook & Co. v. Canonsburg Iron Co., 138 Pa. 189, 16 Atl. 97, 20 Atl. 938; Loeb v. Winnsboro Cotton Oil Co. (Tex. Civ. App.) 93 S. W. 515; McIntyre v. Jackson, 165 Ala. 271, 51 South. 767, 138 Am. St. Rep. 66, and cases cited in 35 Cyc. 208. Very much in point also is the English case of Burton v. Great Northern Ry. Co., 9 Exchequer, 507. In that case Burton had a contract for the cartage between Hatfield and Ware of such merchandise as the railway company might present to him for that purpose; that is, as we understand, such merchandise as the company had occasion to transport between the points named, and it was evidently in contemplation that merchandise for cartage would be furnished during the year covered by the contract and the optional period of its renewal. Some six months later the railway company leased its line to another road and agreed not to carry between Hatfield and Ware, with the result that the cartage service contracted for was no longer required. But the court held that the company was not bound to operate its line, and therefore could terminate Burton's contract without liability to him. The principle upon which this decision rests applies with controlling force, as we think, to the facts of the instant case.

This identical contract was before the Supreme Court of South Carolina, as above stated, and that court held that defendant was not bound to operate its mill in order to make the estimated quantity of linters, and that its obligation was discharged by the delivery to plaintiff of all the linters actually produced. The court says:

"The buyer is bound to take the output, because he agreed to that. The seller is not bound to furnish more than the 'output,' because he has only agreed to furnish that much."

A similar contract, to which plaintiff was a party, was passed upon by the Supreme Court of Alabama, Kenan et al. v. Home Fertilizer & Cotton Oil Co. (Ala.) 79 South. 367, and that court said:

"It is not possible to imply an obligation to make an article from an assumption of the limited obligation to sell, not a definite number of an article, but simply merely what the seller makes. * * * The seller having acted upon the buyer's promise to take his output, the buyer becomes bound to take what the seller has made, in reliance upon the buyer's promise, and the seller becomes likewise bound to deliver the output of his plant."

It is true that the Court of Appeals of Georgia overruled the demurrer to a complaint of plaintiff, based on alleged breach of a like contract for the purchase of linters. Dawson Cotton Oil Co. v. Kenan, McKay & Speir, 21 Ga. App. 688, 94 S. E. 1037. But the complaint

in that action alleged that the Dawson Company shut down its mill wrongfully and in bad faith, that is, for the purpose of evading its contract obligations, and that allegation was necessarily assumed to be true on demurrer. Nevertheless the court took occasion to say:

"Of course, had the defendant discontinued the operation of its mill for some providential cause, or for any cause or causes not in any wise attributable to it, a delivery on the part of the mill of its output up to the time it ceased to operate would be all that the law would require."

And it cited from Brawley v. United States, supra, the paragraph above quoted, emphasizing by italics the final clause that the naming of the quantity is not in the nature of a warranty, but only an estimate of probable amount, "in reference to which good faith is all that is required of the party making it."

The complaint in this suit contains a similar allegation of bad faith, but the record is searched in vain for any evidence to support it. On the contrary, it is shown by convincing and undisputed testimony that persistent efforts were made to continue the business. The mill was shut down solely for lack of money to keep it going. It appears that defendant had little or no working capital, that its own borrowing power was exhausted, and that it had no assets with which to secure advances. In previous years the necessary funds had been procured on notes indorsed by the directors; but this year the directors refused to indorse, as they had the undoubted right to do, and defendant was destitute of other resource. It could not go on without ready money and its inability to borrow is admitted. In this helpless condition it is not perceived that it could do otherwise than suspend operations, and there is nothing of record to indicate that it did not act in good faith in closing down its mill. This being so, we are clearly of opinion that plaintiff failed to make out a cause of action, and the learned trial judge was therefore right in directing a verdict for defendant.

Moreover, and this of itself seems conclusive, the commercial products derived from the process of crushing cotton seed are oil, meal, hulls, and linters. As the value of the latter is barely 10 per cent. of the total, it is not to be supposed that defendant would go out of business in order to avoid the comparatively small loss on its contract with plaintiff. Indeed, we think it evident that this contract had practically nothing to do with the discontinuance of operations; and on the whole case we agree with the Supreme Court of South Carolina in saying:

"The plaintiff proved that the reason the plant was not operated was for the lack of money and the inability to borrow it, and the plant would have been operated if money could have been had. There is not a suggestion to the contrary. It is contrary, too, to the reason of the case that the cotton oil company would forego crushing seed and making oil and cake in order to curtail its by-product of linters."

We have not considered, and do not decide, whether the decision of that court in the former suit was res adjudicata of the question here in dispute, preferring to affirm the judgment on the merits for the reasons above outlined.

Affirmed.