ROBERTSON v. GARVAN, Alien Property Custodian, et al.

(District Court, S. D. New York. June 29, 1920.)

1. Contracts ⊂⇒10(4)—For product of mine held mutual.

A contract whereby a mine owner agreed to sell the total production of its ore at prices varying with the market for the metal, whether construed as a contract by the seller to produce what it chooses and to refrain from selling any of its product to any one except the buyer, or as requiring the seller to continue to produce ore in good faith and sell the total output, is not void for want of mutuality.

2. Contracts ⊂⇒63—Exchange of $1 not sufficient consideration, unless so intended.

The recital in a contract of the consideration of $1.00 paid by each of the parties to the other does not establish sufficient consideration for the contract, where the real considerations intended were evidently the mutual promises of the parties, though the payment of a trifling sum, if intended as the real consideration, will support the contract.

3. Contracts ⊂⇒10(4)—Part performance does not supply want of consideration.

If a contract for the sale of ore produced from a mine was void for want of mutuality, part performance thereof by delivery and acceptance of the ore produced for a time does not bind the buyer to continue to receive the ore produced, but only requires him to pay for that received at the contract price.

4. Estoppel ⊂⇒93(2)—Sales ⊂⇒19, 20—Construction of plant held not estoppel or consideration.

If a contract for the sale of ore produced at a mine was void for want of consideration the construction by the mine owner of a picking plant to enable it to increase its output which was not promised by the mine owner nor requested by the buyer, who had made no misrepresentation as to the facts when entering into the contract, does not estop the buyer from relying on the want of consideration, or establish consideration.

5. Sales ⊂⇒179(3)—Breach as to quantities delivered waived by accepting deliveries.

The breach of a provision in a contract for the sale of ore, which required the seller to ship the ore in as near as possible equal weekly quantities, is waived by the acceptance of ore delivered in unequal quantities, without objection on that ground.

6. Sales ⊂⇒176(3)—Refusal to accept for reason assigned cannot be justified for other reasons.

Where the buyer refused to accept further deliveries under the contract in reliance solely upon the vis major clause in the contract, he can-

---

⊂⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

not, when sued on the contract, claim a breach on other grounds as justification.

**7. Mines and minerals ⬤⟳106—Contract by parent company held not to affect clean hands of subsidiary.**

The fact that a company which owned all the stock of a mining corporation had previously agreed to sell the ore produced at that mine to another does not prevent the mining corporation from suing in equity to enforce a contract by it to sell its ores to defendant.

In Equity. Suit by Frederick Y. Robertson against Francis P. Garvan, as Alien Property Custodian, and others. Decree rendered for complainant.

C. W. Stockton, of New York City (Alfred Sutro, of San Francisco, Cal., of counsel), for complainant.

Francis G. Caffey, U. S. Atty., of New York City (William Travers Jerome and Harland B. Tibbetts, both of New York City, of counsel), for defendants.

AUGUSTUS N. HAND, District Judge. On September 29, 1914, the Mammoth Copper Mining Company entered into a contract with Beer, Sondheimer & Co., dated August 24, 1914, reciting a consideration of "one dollar each to the other in hand paid * * * and the mutual terms and agreements" therein contained, whereby the former agreed to sell and deliver, and the latter to purchase and receive, "the total production of zinc crude ore shipped by the seller from its properties in Shasta county, California." The buyer was not bound to accept any of the product running less than 33 per cent. metallic zinc, but if the seller should produce such zinc the buyer reserved "the option to purchase same under the terms of this contract. If the buyer should not elect to accept such product, the seller has the privilege of disposing of it elsewhere." "All of the product" (runs the contract) "shall be delivered f. o. b. cars at the buyer's smelting works at Bartlesville, * * * shipments to be made in as near as possible equal weekly quantities." The following clause of the contract regulates the payments for zinc content:

"Zinc: $19.00 per ton for product containing 40% zinc, with a St. Louis spelter price of $5.00 per cwt. For each unit of zinc in excess of 40% a credit of $1.00 will be allowed. For each unit less than 40% a debit of $1.00 will be made. For each cent raise in the price of spelter above $5.00 per cwt. a credit of 5¢ per ton will be allowed. For each cent drop in the price of spelter under $5.00 per cwt. a debit of 5¢ per ton will be made. * * * "

The contract was to run one year after the completion of the picking plant which the seller contemplated building, but in no event should "the life of the contract exceed 18 months from the date of its execution." The picking plant was completed March 5, 1915, and prior to the refusal of Beer, Sondheimer & Co. to receive further shipments 1,448.881 tons were shipped and paid for. According to the testimony of Salinger, which is uncontradicted, Eardley, who negotiated the contract for the Mining Company, mentioned 400 or 500 tons per month as the amount of zinc which the Mining Company expected to produce.

Metcalf, the manager of the Mining Company, stated at the trial that, if the price of spelter became so low that mining was unprofitable, the company would probably ship no ore. On October 22, 1914, in reply to a telegram by Salinger as to expectations of production, Metcalf answered:

"Zinc ore tonnage depends altogether on market price of spelter." (Defendants' Exhibit J.)

And on October 25th, Metcalf telegraphed:

"With spelter quotations below five shipments will be very light. If it rises above five will probably ship about 200 tons per month." (Defendants' Exhibit H.)

On November 23 Metcalf further telegraphed:

"If spelter remains above five estimate December tonnage at 200." (Defendants' Exhibit N.)

The Mammoth Company shipped to Beer, Sondheimer & Co. about 230 tons in November, 84 tons in December, 140 tons in January, 500 tons in February, and in March, up to the 17th, 800 tons appear to have been shipped. Further shipments were also made that month. At the end of February the price of spelter had reached more than $9 per cwt., whereas it was less than $5 in October, about $5 in November, about $5.50 in December, about $6 in January, and about $8 in March. Thus it appears to have greatly risen after January.

On March 17, Beer, Sondheimer & Co. telegraphed the Mammoth Company as follows:

"Are advised you shipped from March sixth to ninth fifty tons zinc ore daily whilst your average shipments since beginning contract amount to only about two hundred tons monthly. In view of abnormal conditions we will only accept tonnage reasonably equal to the average monthly amount shipped heretofore. We are unable to receive and smelt any further tonnages in accordance page five of our contract with you. We have advised all other shippers accordingly."

On March 23 the buyers again telegraphed:

"Understand so far eight hundred tons have arrived Bartlesville. Repeat we are unable to accept such tonnages and request you to act accordingly."

On March 24th the buyers telegraphed:

"Referring our yesterday's telegram received further two bill ladings. Cannot accept. What shall we do with bill ladings?"

The Mammoth Company thereafter tendered all the zinc crude ore produced of the grade of 40 per cent. metallic zinc content, or higher, which tender was refused. The clause of the contract referred to in the letter of March 17th was the vis major clause common to business contracts. It cannot, however, be successfully contended that any vis major existed which would excuse performance of a valid contract, and I do not understand that such a position is taken by any of the parties here.

The complainant, who, as assignee of the Mammoth Copper Mining Company, has succeeded to its rights against Beer, Sondheimer & Co., sues the Alien Property Custodian under section 9 of the Trading

with the Enemy Act (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115½e). The defendants resist the suit, principally on the ground that the agreement between the original parties was void for lack of consideration.

[1] The instrument can be construed in three ways. It can be regarded as involving only an obligation to sell all the products which the Mammoth Copper Mining Company might produce and to dispose of such product to no other persons than Beer, Sondheimer & Co., during the· term of the contract, leaving the seller free to produce what it chose. Such an interpretation was placed upon an agreement similar to the present one in the cases of Ramey Lumber Co. v. John Schroeder Lumber Co., 237 Fed. 39, 150 C. C. A. 241, H. M. Pfann & Co. v. J. C. Turner Cypress Lumber Co., 194 Fed. 69, 114 C. C. A. 89, and Kenan, McKay & Spier v. Yorkville Cotton Oil Co., 260 Fed. 28, 171 C. C. A. 64. Burton v. Great Northern Ry., 9 Exch. 507; Williston on Contracts, § 104.

In a second class of cases it has been held that a consideration based upon abstention from dealing is so unreal and so profitless to the buyers that it could never have been intended by the parties, especially where, as here, it was not in literal terms expressed. What the buyers particularly wanted of the seller was ore for their smelters, and not an agreement not to ship to others. Viewed in this light, an agreement which contained no words of promise by the seller to deliver either a fixed amount, or an average amount, or an amount necessary to meet the requirements of the business of the buyers, was held by the Court of Appeals of this circuit in Munson S. S. Line v. Grimwood, 249 Fed. 722, 161 C. C. A. 632, to be dependent on the mere desire of the seller for its immediate advantage. In that case the Munson Line agreed to provide transportation for "all of the coal and coke shipped by [Grimwood] from January 1, 1913, to December 31, 1915." The Circuit Court of Appeals of this circuit held that evidence of Grimwood's dealings with the Munson Line, prior to the date of the agreement, was competent to determine whether it might be supported as a requirement contract, and said in a dictum:

"We may add, however, that, had no offer to show the extent and nature of Munson's previous knowledge of Grimwood's requirements been made, and the trial court had held the contract a 'will, wish, or want' agreement, we should have agreed with such ruling. * * *"

The court goes on to say that in so far as the Ramey Case, 237 Fed. 39, 150 C. C. A. 241, "seems to assert that an agreement otherwise void, as depending for effect on the will, wish, want, or whim of one party, is validated merely by the promise of such party to abstain from dealing in respect of the subject in hand, with any person other than the second party, we are compelled to think it inadvertently used, and to disagree." I believe the court, in reaching the conclusion that the agreement in the Munson Case could not be supported, unless it could be made out to be a requirement contract, must have done so because it did not regard the implied negative covenant not to ship by other lines as the real consideration bargained for. In other words, the Munson Line wanted cargo for its ships, not abstention from shipping

by other lines. If a consideration based upon such abstention were eliminated, and a "requirement" clause could not be justly implied, the court thought that no promise remained on the part of Grimwood to support a contract.

The Grimwood contract, however, was somewhat different from the one here. Grimwood seems to have owned no coal mine. He simply bought and shipped when he found it profitable and practicable to do so. He had entirely ceased to ship coal for some time before suddenly resuming and demanding a number of ships from the Munson Line to carry a large tonnage. It was easy under such circumstances for the court to regard such a highly speculative transaction as based upon the mere whim of Grimwood. In the present case the facts more nearly resemble those related in the opinion of Judge Mayer in Select Pictures Corporation v. Australasian Films (D. C.) 260 Fed. 296, and in the case of Ramey Lumber Co. v. John Schroeder Lumber Co., supra.

The third class of cases is that in which the law implies from the business relations and conduct of the parties an implied agreement on the part of the seller to continue producing in good faith. These cases assume that there is an average or contemplated output of the mine or lumber business which is about to be produced, and that the seller will not consult his own interest in developing the material contracted for, but will, in so far as is consistent with the nature of the plant, furnish the means of carrying out the understanding of the parties. American Distributing Co. v. Hayes Wheel Co. (D. C.) 250 Fed. 109; Pittsburgh Plate Glass Co. v. H. Neuer Glass Co., 253 Fed. 161, 165 C. C. A. 61; Du Pont de Nemours v. Schlottman, 218 Fed. 353, 134 C. C. A. 161; Kenan, McKay & Spier v. Yorkville Cotton Oil Co., 260 Fed. 28, 171 C. C. A. 64; Wells v. Alexandre, 130 N. Y. 642, 29 N. E. 142, 15 L. R. A. 218; Wigand v. Bachmann-Bechtel Brewing Co., 222 N. Y. 273, 118 N. E. 618.

The Mammoth Copper Mining Company was about to construct a picking plant with which to separate its ore. It was plainly contemplated by the parties that, when this plant was installed, ore should be produced and shipped from it. It was completed in March, and the Mining Company began to increase its output accordingly. This fact, rather than Metcalf's theories as to his legal obligations, is important. The Mining Company attempted in good faith to carry out its part of the contract until it was stopped.

Whether the contract under consideration falls under the first class I have mentioned, as I believe it does (see Williston on Contracts, § 104), or under the third, there is ample consideration to support it. In no event can I believe that the Munson Case would go so far as to nullify a contract to sell the entire product of a mine on the ground that it lacks consideration.

Defendants' contention that the clause of the agreement, "shipped from its properties," contemplated a literal shipping, rather than a mere delivery, does not impress me. I think it in no way differs from the succeeding clause, relating to an option to purchase ore running less than 33 per cent. metallic zinc. In each case it seems reasonable

to regard the understanding of the parties to have been that the Mammoth Copper Mining Company would sell and deliver all the ore which it produced to Beer, Sondheimer & Co.

[2] The argument of complainant's counsel that the clause of the agreement, "In consideration of the sum of one dollar ($1.00), each to the other in hand paid," establishes that the contract has a sufficient consideration, is not convincing. The decisions relied upon are principally leases, where a grant might be supported even without consideration. Guffey v. Smith, 237 U. S. 101, 35 Sup. Ct. 526, 59 L. Ed. 856; Raydure v. Lindley, 249 Fed. 675, 161 C. C. A. 585. In the case of Lawrence v. McCalmont, 2 How. 426, 11 L. Ed. 326, there was not only an exchange of nominal consideration, but there existed the most valuable consideration of advance upon a letter of credit. That a trifling sum, if intended as the real consideration, will support a contract, is undoubtedly the case. But the real considerations intended were evidently mutual promises; and the promise of the Mining Company was no more than to ship when, and if, and to the extent, it produced ore. Mere reciprocal receipts of $1 are not ordinarily sufficient. In Velie Motor Car Co. v. Kopmeier Motor Car Co., 194 Fed. at page 331, 114 C. C. A. at page 291, the court said:

" * * * The phrase of the contract which reads, 'and of $1.00 each to the other paid,' etc., imports no consideration. As said by the trial judge, it may well mean the exchange of the same dollar."

This view appears to be approved by Prof. Williston in his book on Contracts (section 115, at page 241), and there is no more thoughtful and eminent American authority on the subject.

[3] The claim that partial performance prevents the defendants from questioning the validity of the agreement is equally unconvincing. It could not render a contract valid which lacked mutuality. The only right a partial performance of an agreement without a consideration gives is that of recovery of the value of anything furnished. The right of action in such a case is not in assumpsit on the contract, but in indebitatus assumpsit. If the buyers here had not exchanged mutual promises, which created a valid bilateral contract, they would only be liable to pay at the agreed price for such shipments of zinc as were made before they refused to take further deliveries. This is plain from the opinion of Circuit Justice Holmes in Sterling Coal Co. v. Silver Spring Bleaching & Dyeing Co., 162 Fed. 848, 89 C. C. A. 520, and of Judge Sanborn in Cold Blast Transportation Co. v. Kansas City Bolt & Nut Co., 114 Fed. 77, 52 C. C. A. 25, 57 L. R. A. 696, as well as from general principles.

[4] As for the suggested estoppel involved in the construction of the picking plant, it nowhere exists. An estoppel technically requires a representation as to an existing fact, and there was none made by Beer, Sondheimer & Co. If the construction of the plant has any bearing on the matters in issue, it must be on the theory that it was a consideration promised, or, at the request of Beer, Sondheimer & Co., furnished in exchange for a promise on their part to take the output. There was certainly no promise by the Mammoth Copper Mining Company to construct this plant, nor any request by the buy-

ers that it be constructed. Under all these circumstances, I cannot see that the construction of the picking plant is a material factor, either as affording a basis for an estoppel, or an element of consideration.

[5, 6] The claims of the defendants that the Mammoth Company broke the contract by failing to ship ore "in as near as possible equal weekly quantities" is without merit. No objection was made to deliveries on this ground, so that the breach was waived as to all ore accepted. As for the ore tendered in March, acceptance of which was refused, the objection to taking it was based solely on the vis major clause. It is too late now to claim a breach on other grounds. More than this, there is no evidence that the Mammoth Company did not ship as nearly weekly quantities "as possible." The picking plant was only just installed, and full production was only just getting under way, when Beer, Sondheimer & Co. refused to take ore. Farrelly v. United States, 159 Fed. 671, 86 C. C. A. 539.

[7] The contention that complainant does not come into equity with clean hands is equally unsound. I do not think it true that the American Metal Company in effect had a contract for the ore in question which it could specifically enforce against the Mammoth Company. It is true it had a contract with the United States Smelting Company, which held all the stock of the Mammoth Company, and that this contract appears to have literally embraced the ore in question. But specific performance could not be enforced against the Mammoth Company, or Beer, Sondheimer & Co., by reason of a prior contract with the parent company for ore which the latter did not as a corporation own. The contract between the American Metal Company and the parent company was made in June, 1914, and only one month later that company, at the request of Metcalf, seems to have attempted to sell the Mammoth ores to the American Metal Company. This shows that the prior contract was not in mind and that the clause which strictly covered any interest the present company had in the Mammoth ore body was not thought by any of the parties to embrace these ores.

The separate corporate identity of the Mammoth Company and the United States Smelting Company was complete, and there are too many theoretical and practical objections to treating the American Metal Company's contract as enforceable against Beer, Sondheimer & Co. to make the contention as to unclean hands tenable. Moreover, there is an entire absence of mala fides. On the whole case, I find that Beer, Sondheimer & Co. broke the contract, and that the complainant must prevail.

An interlocutory decree is granted in favor of the complainant, with a reference to report as to complainant's damages.