**VALTROL, INC., Plaintiff–Appellant,**

v.

**GENERAL CONNECTORS CORPORATION, Defendant–Appellee,**

and

**Bestobell, PLC; Bestobell USA, Inc.; Bestobell UK Limited; Richards Industries, Inc.; W.K. Hile Co., Inc.; Virginia Control Equipment Co., Inc., Defendants.**

No. 88–2628.

United States Court of Appeals, Fourth Circuit.

Argued May 10, 1989.

Decided Sept. 1, 1989.

Rehearing Denied Sept. 26, 1989.

Jack W. Lawrence, Lawrence & Shaw, P.A. (Stanley T. Case, Butler, Means, Evins & Brown, on brief), for plaintiff-appellant.

Orville Gilbert Calhoun (Robert C. Wilson, Jr., Haynsworth, Marion, McKay & Guerard, on brief) for defendant-appellee.

Before RUSSELL and WILKINSON, Circuit Judges, and HADEN, Chief United States District Judge for the Southern District of West Virginia, sitting by designation.

WILKINSON, Circuit Judge:

This case involves interpretation of an exclusive distributorship agreement between a national supplier and local distributor of steam trap equipment. We must determine whether the supplier's cessation of business gives rise to a cause of action for breach of contract or a remedy for recoupment damages. In the absence of contractual intent to the contrary, we hold that the distributor and supplier here together bore the risks and rewards of the joint enterprise. We therefore affirm the district court's grant of the supplier's motion for judgment notwithstanding the verdict on the distributor's breach of contract claim and deny the distributor a new trial on its cause of action for recoupment damages.

In this case, the supplier's warranty liability was limited by the terms of the distributorship agreement to repair or replacement of defective merchandise. We therefore affirm the district court's directed verdict in favor of the supplier on the distributor's warranty cause of action for consequential and incidental damages. We reverse, however, the district court's grant of a new trial on the supplier's counterclaim against the distributor and reinstate the jury's verdict in favor of the distributor.

I.

In October of 1984, Valtrol Incorporated and the Bestobell Steam division of General

Connectors Corporation executed a contract in which Valtrol was given the exclusive right to distribute Bestobell steam traps and related products in Virginia, North Carolina, South Carolina, Georgia, and portions of Tennessee and Texas. The contract was a renewal of an exclusive distributorship relationship dating back to November of 1979.

Under the terms of the exclusive contract, both parties were obliged to use commercially reasonable efforts to promote the product. Bestobell agreed to aid Valtrol's distribution efforts by providing sales assistance and support. The distributorship agreement listed Bestobell's contractual obligations as follows:

1. National advertising in media selected by Bestobell.
2. Co-operative advertising and promotional support....
3. Product literature as selected by Bestobell.
4. Technical support related to the products.
5. Direct sales assistance on major opportunities (as jointly determined by Bestobell and [Valtrol]).
6. Sales and technical training seminars.
7. Marketing data.
8. Deliver Product on a timely basis.

Valtrol was obligated by the express terms of the contract to:

1. Use good, commercially reasonable efforts to promote the products.
2. Maintain inventory adequate to support the sales territory.
3. Provide a sales staff sufficient in number to properly cover the sales territory and adequately trained to promote and service the products and answer questions of end users. Additionally [Valtrol] will have at least one person devoted specifically to the sales and service of the products.
4. Provide Bestobell with written sales forecasts on an annual and quarterly basis, and provide requested information concerning sales efforts, potential sales, and leads.
5. Keep the marketing information and distributor pricing strictly confidential.
6. Make sales calls only within [Valtrol's] territory, and not to make sales calls or shipments outside of [Valtrol's] territory....
7. To sell the product through its own employees or subdistributors as [Valtrol] may deem appropriate.

The agreement was to remain in effect until June 30, 1986, unless terminated or modified, and would automatically be renewed each July 1 unless the parties failed to satisfy their contractual obligations. The agreement could be terminated on ninety days notice based on mutual consent. The substantive law of Texas was to govern the contract.

In May of 1986, General Connectors notified Valtrol and its other distributors that all contracts with its Bestobell Steam division would be terminated as of June 30, 1986. Transactions after that date were "subject to acceptance by Bestobell Steam" and the division's last shipment of steam traps to Valtrol occurred in August of 1986. In November of 1986, General Connectors discontinued its steam trap division and the division's assets were sold to Richards Industries Incorporated. Richards Industries thereby became the exclusive United States distributor of Bestobell steam traps.

According to the district court, it was undisputed that General Connectors discontinued its steam trap division due to continuing net operating losses, which it had experienced since the division was formed in March of 1984. The district court found that the division's actual net losses ranged from $250,000 to $400,000 per year.

On February 17, 1987, Valtrol filed this diversity action alleging sixteen causes of action, including claims for breach of express and implied warranties, breach of contract, and recoupment, and sought, *inter alia,* consequential damages for cost of cover and lost profits. The complaint named seven defendants including General Connectors. General Connectors filed a counterclaim against Valtrol, alleging that Valtrol purchased steam equipment for

which it had refused to pay. Valtrol contended, however, that it was entitled to offset its obligations to General Connectors with product discounts allegedly given by General Connectors to assist Valtrol in establishing its marketing operations in Texas. The case was tried before a jury in June of 1988.

During the course of the trial, the district court directed verdicts in favor of General Connectors on fourteen of Valtrol's claims, including its cause of action for breach of express and implied warranties. The district court, however, denied General Connectors' motion for directed verdicts on Valtrol's causes of action for breach of the distributorship contract and recoupment. These alternative theories and General Connectors' counterclaim were submitted to the jury. The other six defendants were dismissed from the action.

On June 23, 1988, the jury found in favor of Valtrol on its breach of contract cause of action and returned a verdict in the sum of $215,000. The jury also found in favor of Valtrol on General Connectors' counterclaim. General Connectors filed a timely motion for judgment notwithstanding the verdict or, in the alternative, for a new trial, contending, *inter alia*, that its cessation of business did not constitute a breach of the distributorship agreement. The district court agreed and granted General Connectors' motion for judgment notwithstanding the verdict and its motion for new trial in the event the judgment notwithstanding the verdict was reversed on appeal. The district court also ordered, *sua sponte*, a new trial of General Connectors' counterclaim against Valtrol.

Valtrol appeals.

## II.

### A.

◼ A primary purpose of contract formation is to provide stable business relationships in the face of generally changing economic conditions. Parties who seek commercial stability in shifting economic circumstances accomplish this goal by allocating risks. There may be risks, however, which, through inattention or design, are not allocated by contract, and both parties therefore stand to rise or fall together on the success of a joint enterprise. We believe this is such a case. We thus agree with the district court that the Bestobell Steam division's cessation of business did not constitute a breach of General Connectors' distributorship agreement with Valtrol and affirm its grant of General Connectors' motion for judgment notwithstanding the verdict.

When interpreting contracts, courts are compelled to give effect to the intent of the parties, *Western Beef, Inc. v. Compton Inv. Co.*, 611 F.2d 587, 592 (5th Cir.1980); *City of Pinehurst v. Spooner Addition Water Co.*, 432 S.W.2d 515, 518 (Tex.1968), which is measured first and foremost by the language of the contract itself. *See Kimbell Foods, Inc. v. Republic National Bank of Dallas*, 557 F.2d 491, 496 (5th Cir.1977). Because it is unambiguous, interpretation of the contract here is for the court in the first instance. *Steuber Co. v. Hercules, Inc.*, 646 F.2d 1093, 1098 (5th Cir.1981); *Trinity Universal Ins. Co. v. Ponsford Bros.*, 423 S.W.2d 571, 575 (Tex. 1968).

◼ Nothing in the contract expressly required General Connectors to remain in the steam trap equipment business or addressed the consequences if General Connectors went out of the steam trap equipment business. Moreover, Valtrol has failed to establish that the distributorship agreement included an implied contractual duty to remain in business. Implied covenants are disfavored, and must clearly arise from the language used, or be indispensable to effectuate the intent of the parties. *See Kutka v. Temporaries, Inc.*, 568 F.Supp. 1527, 1535 (S.D.Tex.1983); *Danciger Oil & Refining Co. of Texas v. Powell*, 137 Tex. 484, 154 S.W.2d 632, 635 (1941). Here, the language of the contract does not give rise to "an inference that it is absolutely necessary to introduce the term to effectuate the intention of the parties." *See* 11 *Williston on Contracts* § 1295 (3d ed. 1968).

Valtrol asserts that a plain reading of the distributorship contract shows a long-term agreement requiring the parties to deal with one another. We disagree. The distributorship contract here resembles an output or requirements contract, which, like a distributorship contract, generally "is not a promise to buy or sell any specific amount of the goods." 3 *Corbin on Contracts* § 569 (1960). Both types of contracts may include an implied obligation to use commercially reasonable efforts to advance the joint enterprise; neither includes an implied promise that the parties will continue to operate their businesses in all circumstances. The contract did preclude General Connectors from dealing with other distributors in Valtrol's sales territory, but there is no issue of fraud and Valtrol does not contend that General Connectors' sale of assets was a sham transaction undertaken to avoid the distributorship relationship. Absent contractual intent to the contrary, the parties together bore the risk of either party going out of business. *See HML Corp. v. General Foods Corp.*, 365 F.2d 77, 80–82 (3d Cir.1966); *In re United Cigar Stores Co. of America*, 72 F.2d 673 (2d Cir.1934); *Kenan, McKay & Spier v. Yorkville Cotton Oil Co.*, 260 F. 28 (4th Cir.1919). As an unusually high tide lifts all boats, an unusually low tide grounds them.

The question of whether a cessation of business constitutes a breach of a distributorship contract does not often arise because most distributorship arrangements may be terminated unilaterally upon notice by either party. Here, however, the standard contract was altered at the suggestion of Valtrol, and termination of the distributorship agreement between General Connectors and Valtrol required mutual consent. The contract provided that it would remain in effect until June 30, 1986:

> unless terminated or modified, and will automatically be renewed upon each successive July 1 unless the Distributor fails to comply with the Distributor obligations ... or unless manufacturer fails to supply sales assistance.... Additionally this agreement can be terminated on

short notice such as 90 days based on mutual consent.

When read in light of this termination provision, Valtrol contends that the contract contemplates a long-term agreement between the parties and that the cessation of business—regardless of economic circumstances—does not relieve the parties of their contractual obligations in the absence of mutual consent. We, however, decline to adopt Valtrol's interpretation. The termination provision, like the contract itself, presupposes the existence of a viable joint enterprise and that both parties are operating in the market for steam traps. An oblique reference such as the termination clause does not rise to the level of an implied obligation to remain in business. The specificity with which the parties' contractual obligations are discussed in their agreement supports this conclusion. Moreover, our reading of the termination clause protects Valtrol in a number of ways. General Connectors, for example, could not unilaterally terminate its contractual relationship with Valtrol and then award Valtrol's sales territory to another distributor. Valtrol therefore continues to receive the benefit of its bargain with General Connectors.

We recognize that a supplier's cessation of business may present hardships for a distributor. The same is true, however, when a distributor goes out of business and the supplier is forced to find a new outlet for its products. In the interim, the supplier's competitors may move to fill the void left in the market by the distributor's exit and the supplier's position in the market may decline. These costs are simply those that inhere in the disruption of any supplier/distributor relationship and are therefore foreseeable to the parties and allocable by contract. General Connectors is not required to operate its steam trap division at a loss for a period of indefinite duration and is not liable at law for a downturn in the steam trap equipment market.

■ We do not hold that economic difficulties generally relieve a party of its contractual obligations. Where a continu-

ing enterprise and executory contract obligations exist, a party is not excused from performance merely because the terms of the contract are no longer economically favorable. *See Measday v. Kwik–Kopy Corp.*, 713 F.2d 118, 126 (5th Cir.1983). A supplier cannot escape preexisting obligations in an attempt to strike a better bargain; it also is not liable to a distributor for going out of business in the absence of contractual intent to the contrary. The contractual obligation to use commercially reasonable efforts to promote the product was not the same as a contractual obligation to remain in business. General Connectors is therefore not liable in contract for its cessation of business [1] and Valtrol may not recover its alleged consequential damages for cost of cover and lost profits.[2]

### B.

Valtrol also contends that it is entitled to a new trial on its claim for recoupment damages. We disagree.

■ The doctrine of recoupment provides a remedy in those cases where a supplier requires a distributor to make a significant investment in furtherance of a distributorship and then terminates the relationship leaving the distributor with substantial unrecouped expenditures. *See Ag–Chem Equip. Co. v. Hahn, Inc.*, 480 F.2d 482, 486 (8th Cir.1973). A recoupment remedy is unavailable, however, if the distributorship agreement was terminated with "just cause." *See Allied Equip. Co. v. Weber Engineered Products, Inc.*, 237 F.2d 879, 882 (4th Cir.1956). *See also Schultz v. Onan Corp.*, 737 F.2d 339, 346–47 (3d Cir.1984). Similarly, a recoupment remedy is unavailable if termination of the

distributorship agreement was justified, as a matter of law, and not unreasonable. Here, the rights, duties, and obligations of the contracting parties were governed by an agreement which did not obligate General Connectors to continue operating its steam trap division. General Connectors had no contractual duty to stay in business and Valtrol cannot rely on the doctrine of recoupment to reallocate risks which both parties assumed in their contractual relationship.

### III.

#### A.

■ We also reject Valtrol's assertion that the district court erred by finding that Valtrol's damages for breach of warranty were limited to repair or replacement of defective merchandise. The parties bargained for an exclusive repair or replacement warranty which specifically and conspicuously disclaimed all implied warranties of fitness and merchantability. *See* S.C.Code Ann. §§ 36–2–316 & 36–2–719. The express limited warranty controls and precludes Valtrol's cause of action for incidental and consequential damages.

Valtrol advances several different interpretations of South Carolina law contending that the parties' subsequent writings and conduct altered the terms of the distributorship relationship. For example, it is undisputed that several purchase orders sent by Valtrol to General Connectors included terms which would have materially altered the limited warranty in the distributorship agreement. Valtrol contends that no contract therefore existed pursuant to S.C.Code Ann. § 36–2–207(2), and that the

---

**1.** Valtrol asserts that there was no cessation of business here because General Connectors merely sold the assets of one of its divisions and continued to function as a viable entity. This argument, however, ignores the fact that the Bestobell Steam division was the only General Connectors division to sell steam trap equipment. After the sale of the steam trap division, there was no basis for a continuing commercial relationship between General Connectors and Valtrol.

**2.** While acquisition of a business through the purchase of stock ordinarily does not permit the successor corporation to avoid the contractual liabilities of its predecessor, acquisition of the same business through the purchase of its assets may or may not lead to liability. The successor corporation, for example, may agree, either expressly or impliedly, to assume the liabilities of the predecessor corporation. *See* P. Blumberg, *The Law of Corporate Groups: Substantive Law* 278–79 (1987). The question of successor liability, however, is not presented here. Indeed, Richards Industries is not party to this appeal.

parties thereafter created a contract by virtue of their conduct pursuant to S.C. Code Ann. § 36–2–207(3).[3] According to Valtrol, the Uniform Commercial Code's implied warranties of fitness and merchantability and the right to recover consequential and incidental damages were thus included in the agreement as a matter of law.

■ We find this argument unpersuasive. Each of Valtrol's purchase orders operated as an acceptance or confirmation of General Connectors' continuing offer to sell steam equipment "even though it state[d] terms additional to or different from those offered or agreed upon" by the parties. S.C.Code Ann. § 36–2–207(1). Although "additional" terms may become part of the contract between merchants, § 36–2–207(2) does not speak to "different" terms and Valtrol's purchase order warranties therefore cannot operate to negate the limited warranty contained in the distributorship agreement. *See Reaction Molding Technologies, Inc. v. General Electric Co.,* 588 F.Supp. 1280, 1289 (E.D.Pa.1984). Furthermore, even if treated as "additional" terms, Valtrol's purchase order warranties would materially alter the existing contract and therefore cannot become part of the distributorship agreement pursuant to the express terms of § 36–2–207(2)(b). Finally, § 36–2–207(3) applies only in cases where "the writings of the parties do not otherwise establish a contract," and is therefore inapplicable here. Valtrol's position would sanction the unilateral imposition of terms which operated in clear contradiction to the express warranty provisions incorporated in the contract. The Code does not sanction this sort of departure from a commercial bargain. We thus affirm the district court's directed verdict in favor of General Connectors as to Valtrol's warranty cause of action.

**B.**

Finally, General Connectors alleged in its counterclaim that Valtrol had purchased steam equipment for which it had refused to pay. Valtrol argued at trial, however, that the product discount plan was not a debt owed to General Connectors but rather an incentive provided by General Connectors to assist Valtrol's marketing efforts in its new sales territory. The jury rejected General Connectors' counterclaim, but the district court, *sua sponte,* set aside the jury's verdict in favor of Valtrol. According to the district court, Valtrol's defense to the counterclaim was based primarily on the argument that it was prevented from satisfying its debts because of General Connectors' breach of the distributorship contract. Finding that General Connectors had not breached the agreement, the district court held that General Connectors was entitled to a new trial of its counterclaim. We think the district court erred in setting aside the jury verdict.

■ Specifically, we agree with Valtrol that the district court erred by failing to give Valtrol notice of its reconsideration of General Connectors' counterclaim and by failing to provide Valtrol an opportunity to address the sufficiency or appropriateness of the jury's verdict. In its post-trial motion, General Connectors did not request a new trial of its counterclaim against Valtrol. Although a district court may grant a

**3.** S.C.Code Ann. § 36–2–207 provides that:

(1) A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.

(2) The additional terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless:

(a) the offer expressly limits acceptance to the terms of the offer;

(b) they materially alter it; or

(c) notification of objection to them has already been given or is given within a reasonable time after notice of them is received.

(3) Conduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract. In such a case the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of this act.

new trial on its own initiative for reasons not stated in a timely post-trial motion, the court is directed to give the parties "notice and an opportunity to be heard on the matter." *See* Fed.R.Civ.P. 59(d). *See also* 6A J. Moore, J. Lucas & G. Grother, Jr., *Moore's Federal Practice* ¶ 59.11 (2d ed. 1987). The notice requirement may not be ironclad, *see* 11 C. Wright & A. Miller, *Federal Practice & Procedure:* Civil § 2813 (1973), but the rule clearly contemplates notice in the ordinary case. *See Roy v. Volkswagenwerk Aktiengesellschaft,* 781 F.2d 670, 671 (9th Cir.1985). *See also* 6A J. Moore, J. Lucas & G. Grother, Jr., *Moore's Federal Practice* ¶ 59.09[2] (2d ed. 1987).

More fundamentally, the district court misconstrued Valtrol's defense to General Connectors' counterclaim. Valtrol argued at trial that the product discount plan was established by General Connectors to assist Valtrol's marketing efforts in its new Texas sales territory. The plan was devised to assist Valtrol in advertising and promoting General Connectors' products without appearing to favor Valtrol over General Connectors' other distributors. The plan was not a loan to be repaid to General Connectors. Valtrol therefore provided an explanation for the jury's verdict which was supported by the evidence and independent of its breach of contract cause of action. We reverse the district court's grant of a new trial and reinstate the jury's verdict in favor of Valtrol as to General Connectors' counterclaim.

### IV.

In sum, we affirm the district court's grant of General Connectors' motion for judgment notwithstanding the verdict on Valtrol's breach of contract cause of action, but reverse the district court's grant of a new trial on General Connectors' counterclaim against Valtrol. We also hold that Valtrol is not entitled to a new trial on its cause of action for recoupment damages, and that the district court did not err by directing a verdict in favor of General Connectors on Valtrol's cause of action for incidental and consequential damages resulting from General Connectors' alleged breach of express and implied warranties.

For the foregoing reasons, the judgment of the district court is

AFFIRMED IN PART; REVERSED IN PART.