# F. W. BROCKMAN COMMISSION COMPANY, Appellant, v. EDWARD AARON, Respondent.

### Kansas City Court of Appeals, June 28, 1910.

1. **APPELLATE PRACTICE: Value of Absurd or Incredible Evidence.** While appellate courts uniformly adhere to the rule that the credibility of witnesses and the weight to be given their testimony are issues of fact and not of law, the rule has never been carried to the length of requiring courts to accord probative value to testimony that is so palpably false or absurd that no human mind would give it credence. It is within the province of the court to ascertain whether or not testimony has any evidentiary strength, and if it is found to be impotent to cast it aside.

2. **EVIDENCE: Manufactured Market Quotations.** Where a "committee" was accustomed to meet and establish market quotations for eggs by a process of figuring on local and foreign sales and other problematical conditions, the quotations as fixed were not an authentic record of market sales and transactions, but were the mere opinion of a committee as to what they believed the market values should be for the day. Evidence of such quotations is pure hearsay and incompetent.

3. **APPELLATE PRACTICE: Immaterial Error.** Errors in giving an instruction which was a comment on the evidence, and in the admission of incompetent evidence, are immaterial when it is clear that they did not have an influence on the minds of the jury to the prejudice of the party against whom they were committed, and where it is impossible to find them reflected in the verdict.

4. **PRACTICE: Verdict Responsive to Evidence.** Defendant having contracted to sell plaintiff ten cars of eggs delivered one car and refused to deliver the other nine cars. Plaintiff sued for damages for breach of contract, and recovered a verdict for an amount which was unsatisfactory to it, and it appealed. The evidence tended to show that the difference between the contract price and the market price on the day of the breach of the contract was greatly in excess of the amount awarded by the jury. The evidence of the market values was opinion evidence, and therefore only advisory. There were also other elements in connection with the evi-

dence as to the market price, to-wit: the difference between the small sales evidencing the market price, and the large sale in question, and also the fact that the sale in question included second hand egg cases as well as eggs. Under the circumstances the jury were not bound by such market price, but were entitled to use their own judgment and common knowledge of the subject within reasonable evidentiary limits. Therefore the fact that the amount of the verdict does not coincide with any of the market prices named by the witnesses does not require a holding that the verdict is not based on the evidence.

Appeal from Jackson Circuit Court.—*Hon. Walter A. Powell*, Judge.

AFFIRMED.

*Haff & Michaels* for appellant.

(1) The best evidence of market value is the price realized in actual, open sales, and "quotations" made by a committee of an exchange which are materially lower than such actual prices are not evidence of market value. 16 Cyc. 143; 19 Cyc. 1153; 26 Cyc. 819; Parlin & Orendorff Co. v. Boatman, 89 Mo. App. 48; Commission Co. v. Railroad, 64 Mo. App. 593; Fountain v. Railroad, 114 Mo. App. 683; Henderson v. Railroad, 126 Mo. App. 612; Meriwether v. Railroad, 128 Mo. App. 666; Brandom v. Railroad, 154 Mo. App. 94; Bank v. New Bedford, 175 Mass. 257; Railroad v. Reeves, 97 Va. 284. (2) The verdict was not responsive to the evidence or to the instructions, and showed that the jury misconceived the issues, and the verdict must be set aside because of that. Cole v. Armour, 154 Mo. 355; Blackwell v. Adams, 28 Mo. App. 64; Woodson v. Harmon, 85 Mo. 446; Edwards v. Railroad, 82 Mo. App. 485; Fairgrieve v. Moberly, 29 Mo. App. 152; Huff v. Thurman, 78 Mo. App. 638. (3) Defendant's instruction No. 7 was confusing; it singled out a particular fact, made it conspicuous and commented on it,

and was therefore clearly erroneous. Rickey v. Tenbroeck, 63 Mo. 536; Wehle v. Haviland, 69 N. Y. 448; Doud v. Reid, 53 Mo. App. 562; Railroad v. Stock Yards Co., 120 Mo. 565; Jones v. Jones, 57 Mo. 138; Swink v. Anthony, 107 Mo. App. 607.

*Eppstein, Ulmann & Miller* for respondent.

JOHNSON, J.—Action for breach of contract. The answer is a general denial. A trial to a jury resulted in a verdict and judgment for plaintiff in the sum of $341.55, but being dissatisfied with the amount of the verdict, plaintiff brought the case here by appeal. Defendant is satisfied and did not appeal.

Plaintiff complains of errors committed by the court in the rulings on evidence and on the instructions and further contends that the verdict must have been the product of a compromise among the jurors since the amount of the damages allowed is without any evidentiary support. The parties to the transaction which gave rise to the suit were Mr. Brockman of St. Louis, Mr. Aaron of Kansas City and Mr. Papendick, sometime of Kansas City, all "butter and egg" merchants. One day in February, 1905, these gentlemen with another "butter and egg" man met in a cafe in St. Louis, and their conversation became an animated discussion of the conditions of the egg market. Brockman was a "bear" on eggs, Aaron and Papendick were "bulls." Finally, Aaron offered to deliver to Brockman, during the month of April, ten cars of "current receipt" eggs, f. o. b. cars at Kansas City, at 14 1-2 cents per dozen, cases included. Brockman accepted the offer and before the parties separated, Aaron allowed Papendick a share in the bargain by accepting the latter's offer to deliver to him one-fourth of the eggs required to fill the order at the price of 14 1-2 cents per dozen.

It is explained that "current receipt" eggs means "those that come in currently from the country in the regular course of receipts from shippers. In this case, they were current receipts from Kansas and Missouri." The magnitude of the transaction will appear from the fact that it involved the delivery of 1,440,000 eggs to be collected in the regular course of business from shipments to the Kansas City market.

The first difference between Brockman and Aaron occurred over the confirmation of the oral contract. In his letter of confirmation Aaron stated "stock is to consist of Missouri and Kansas eggs in cases as we receive them from shippers." Brockman rejoined, "If you will recollect, it was understood and agreed upon that they were to be new No. 2 cases. We could not for a moment consider the eggs in all sorts of ramshackle cases. The eggs are to be taken as they come from shippers but must be in new No. 2 cases." Aaron answered "According to this conversation the cases are to be accepted by you as we receive them from our shippers but it is understood that such cases are to be in good condition and not any ramshackle packages." Brockman replied: "Yours of the 3d has been received and we confirm the conversation with Mr. Aaron in regard to the cases which are to be good cases and all poor or badly worn to be left out." Here the matter of the cases was suffered to drop with victory for Mr. Aaron who carried the point that second hand cases might be used.

A few days later Mr. Papendick wrote Mr. Aaron confirming his contract to sell Aaron 1000 cases "April current receipts to go to F. W. Brockman Commission Company at 14 1-2 cents incl. f. o. b. Kansas City," and in the letter expressed the optimistic opinion that "It will rain eggs for the next thirty days and there ought to be thirty or sixty cents profit in the sale to Brockman." This language was meant to convey the

statement that there would be a profit to the vendors of from twelve to twenty-four hundred dollars, on the entire sale to Brockman.

Aaron shipped one of the ten cars to Brockman in April and attached the bill of lading to a sight draft for the purchase price. Brockman paid the draft and accepted the shipment. Aaron shipped no more eggs to Brockman nor did Papendick ship any to Aaron. Becoming fearful that Aaron intended to default in the performance of his contract, Brockman arrived in Kansas City in the morning of Saturday, April 29th. Fortunately for him, the manager of Armour & Company at St. Louis, a Mr. Volker, arrived in Kansas City on the same train. He was destined to play an important role in the events of the day. It is denied that Volker came to Kansas City by prearrangement. Brockman testified on cross-examination:

"We met possibly in the car going down but I didn't meet him on the train. That is after we left the station. Q. Didn't you go to town with him from the station? A. That's possible. Q. Didn't you have breakfast with him that morning? A. Quite likely. . . . Q. Wasn't he on the Exchange at the same time with you? A. Yes, sir. Now, wait a minute. I say yes, sir, but I am not certain about that. Q. Did you go to dinner with him after the Exchange? A. No, sir. I don't believe I did. I can't recollect. Those were incidents I paid no attention to."

The witness's recollection of mere social episodes was poor but it was good with respect to sterner events, not the least important of which was the timely intervention of Volker in a manner to disconcert Aaron and to give semblance of reality to the robust claim for damages Brockman was preparing to make. The encounters between Brockman and Aaron were characterized by keen and wary maneuvering. The final meeting occurred at Aaron's place of business at about six o'clock p. m. Volker was there—on the outside. Brockman

·demanded delivery of the nine cars of eggs as per .contract. Aaron refused. Brockman testified:

"I notified Mr. Aaron if he did not deliver the eggs to me I would buy them for his account. He said, 'I don't care,' said several things."

Brockman then stepped out to Volker and, in the hearing of Aaron who was careful to keep in earshot, asked at what price Volker would sell him nine cars of current receipt eggs for delivery that day. Volker replied 15 1-4 cents per dozen. Brockman accepted the offer and gave his check to Volker for the purchase price. Armour & Company had enough eggs in storage to fill .the order but made no actual delivery to Brockman and, some time later, Brockman "resold" the eggs. to Armour & Company for just enough to cancel his check and pay accrued storage charges.

Using as a basis the price he was "compelled" to pay Volker for eggs, Brockman on May 3d, made out a claim for $810 damages, drew on Aaron for that amount and wrote Aaron asking him to "please protect same on presentation." Aaron refused to pay the draft and this suit followed. The position taken by Aaron was that Brockman had suffered no actual damages on account of the breach of contract for the reason that the market value of eggs in Kansas City on April 29th was 14 1-2 cents per dozen—the price agreed upon in the contract. Aaron says that when Brockman demanded a settlement on account of damages, he told him that he "would give him all that was coming to him," which was nothing.

To sustain his contention that the market price of "current receipt" eggs in Kansas City was only 14 1-2 cents, Aaron succeeded in introducing in evidence, over the strenuous objections of plaintiff, the market quotations for that day of the Produce Exchange of Kansas City. This "Exchange" was a voluntary association of local produce dealers. Quarters were maintained in a hotel; there was a blackboard in the room and an officer

or employee was stationed at the board to chalk up current sales, bids, market quotations, etc. On April 29th, the actual sales of current receipt eggs listed on the blackboard were at prices ranging from 15 to 15 1-2 cents per dozen. The Exchange had an "egg committee" of three members who met at a stated hour each day and prepared market quotations. In fixing prices, this committee did not hold itself bound entirely by the actual sales and bids posted on the blackboard but treated such facts only as elements of the problem. Other elements considered were market quotations from other commercial centers, the foreign demand, the money market, etc.

After due deliberation the market prices then would be fixed at what the committee thought they should be, and these prices were published in a journal as the market prices for that day. We quote from the testimony of one of defendant's witnesses: "Q. You don't mean that this committee got together and fixed the market value, do you, the market price or quotation? A. Well, it's considered the committee's price is sanctioned by the Exchange and is the market value, I judge. . . . Q. According to that Exchange down there there are three men who get together and go into a little room by themselves and they come out and tell the people on the outside that they have fixed a market quotation for eggs current receipts at a certain price, isn't that correct? A. Yes, sir. . . . Q. You don't mean to say that this manufactured market by this committee, Mr. Hurst, that you can force the members of your Exchange to sell at that price? A. A man does not have to sell if he does not want to. Q. Have you ever sold eggs above the quoted market? A. Yes, sir. Q. And you bought them below? A. Yes, sir. Q. And above? A. Yes, sir."

It would appear from the testimony of this and other witnesses that no one considered himself bound

by these quotations except, perhaps, those who were ignorant of the method of their preparation. Aaron enjoyed the advantage of being a member of the Kansas City Exchange; Brockman was not so fortunate, but was given the privileges of a guest during the morning of April 29th, and saw the quotations posted on the blackboard which if a true portrayal of the egg market would wipe out his carefully expanded claim for damages. The learned trial judge was bothered for sometime over the question of the admissibility of these "market quotations" in evidence, but finally admitted them. This ruling is the principal error assigned by plaintiff.

The seventh instruction given at the request of defendant affords the ground of another assignment of error. It is as follows:

"The court instructs the jury that even if you should find and believe from the evidence that the defendant failed to deliver the eggs in question, and even if you further find and believe that, upon such failure, the plaintiff purchased a like quantity of eggs from another dealer at a higher price than the contract price, such higher price paid by the plaintiff to such other dealer cannot be considered as a basis for estimating the plaintiff's measure of damages, unless you find from the evidence of such higher price so paid by plaintiff to such other dealer was not in excess of the market price of the kind of eggs in question at Kansas City, Missouri, on April 29, 1905, and if you find and believe from the evidence that the market price at Kansas City, Missouri, on April 29, 1905, was 14 1-2 cents per dozen and the same as the contract price, then the plaintiff is not entitled to any actual damages, and it matters not that he may have purchased eggs from another dealer at a price in excess of 14½ cents per dozen."

The objection to this instruction is that "it was confusing, singled out facts and was a comment on the evidence."

On May 9th, Papendick paid Aaron $125, and received the following receipt:

"Kansas City, May 9, 1905.

"Received of F. C. Papendick & Co. $125 in full settlement of loss to us on account of non-delivery of 1000 cases of April current receipt eggs which were to have been delivered to F. W. Brockman Commission Co. for our account.                    Aaron & Company."

Aaron was hard pressed by counsel for plaintiff to explain his receipt of this money. First he said: "About the middle of April Mr. Papendick came to my place of business and says, 'Well, Aaron, I don't know how this market is going, because the day of settlement will be well along the latter part of this month. What will you take to let me out of the non-delivery of a thousand cases of eggs?' and I says, 'What will you give?' He says, 'I will give you a hundred and twenty-five dollars.' I says, 'I will accept it; because I don't think the market will be any higher, and may be a little less.' "

That explanation sounded reasonable, but the trouble with it was that the settlement was not made in the middle of April but in May, after the contract had been breached and damages had accrued. Later, in the cross-examination, Aaron evidently realized that something was wrong and availed himself of the first opportunity to strengthen his lines. It came with the following question:

"Now you say this was in settlement of the Aaron-Brockman transaction—two and a half cars? A. If you want me to explain that, I will explain it to you. Q. Yes; I think it needs it. A. At that time Mr. Papendick was in my office after we got to talking about deliveries of these thousand cases, and I says, 'Can you deliver me a car about the 15th?' I think I had a car to go out either to Seattle or California, and he says, 'I will deliver you a car for that day,' and

he failed to deliver it, and it was just a little flurry on at that time; the market had advanced sharply for a day—almost a cent, and Mr. Papendick failed to deliver this car and I had to go out on the market and buy this car because I had sold it to go out this day on a shipping order and Mr. Papendick was indebted to me for this. Perhaps that is why he gave me the hundred and twenty-five dollars, to settle the whole case, and didn't deliver any of the eggs. Q. Please explain why, in this exhibit, you didn't say it was for a loss which you had on a car in April. A. That might have been an oversight."

While appellate courts uniformly adhere to the rule that the credibility of witnesses and the weight to be given their testimony are issues of fact and not of law, the rule has never been carried to the length of requiring courts to accord probative value to testimony that is so palpably false or absurd that no reasonable mind would give it any credence. It is within the province of the court to ascertain whether or not testimony has any evidentiary strength and if it is found to be impotent to cast it aside as though it had not been given. Guided by this rule, we shall make free use of the pruning knife by lopping off the patent falsities and absurdities with which the evidence abounds in order that, if possible, the case may be reduced to orderly and decent limits.

Neither party deserves to win since each has been guilty of unfair practices against the other and has endeavored to justify his conduct in his testimony. This criticism is not to be taken as a reflection on the attorneys in the case for we give them credit for sincerity. Of Brockman's conduct, his counsel say in their brief: "Brockman erroneously thought that it was necessary for him to purchase nine cars of 'current receipt' eggs on April 29, 1905, in order to protect himself, and accordingly he made diligent effort in that direction. The

only party he could find who had that quantity of eggs in Kansas City was Armour & Company and he bought and paid for nine cars from them at 15 1-4 cents per dozen. These eggs were never delivered to plaintiff but were held by Armour & Company for plaintiff company and were afterwards resold by plaintiff to Armour & Company."

That is a mild way of putting it. Counsel for defendants say in their brief that it was a "wash sale," a term we are not familiar with, but we think it must correctly describe this sale. There is no room for any other reasonable inference than that Brockman and Volker devised a fictitious sale for the sole purpose of enhancing Brockman's claim for damages. We dismiss this so-called sale from further consideration.

Next we apply the knife to the "market quotations" which the court erroneously received in evidence. They were just as fictitious as the "sale" we have considered, but if they were not concocted for the benefit of Aaron, the evidence shows beyond question that they are not an authentic record of market sales and transactions, but were the mere opinion of a committee as to what the market values should be for that day. The evidence was pure hearsay and should have been rejected. [16 Cyc. 143; 19 Cyc. 1153; 26 Cyc. 819; Parlin & Orendorff Co. v. Boatman, 89 Mo. App. 48; Commission Co. v. Railroad, 64 Mo. App. 593; Fountain v. Wabash Ry., 114 Mo. App. 683; Henderson v. Railway, 126 Mo. App. 612; Meriwether v. Railway, 128 Mo. App. 666; Brandom v. Railroad, 154 Mo. App. 94; National Bank v. New Bedford, 175 Mass. 257; Norfolk & Western Ry. v. Reeves, 97 Va. 284.]

For argument we are willing to concede that appellant's seventh instruction is subject to the objections urged against it, but counsel for plaintiff fail to make clear to us that these errors had or could have had any effect to produce the verdict under consideration. Had

the verdict been for defendant we would hold the errors prejudicial, but in returning a verdict for plaintiff for substantial damages, the jury necessarily rejected the market quotations and were uninfluenced by the seventh instruction. Error to be ground for reversal of a judgment must appear to have had at least a possible influence over the minds of the jury to the prejudice of the party against whom it was committed. The errors under consideration clearly were harmless, since it is impossible to find them reflected in the verdict. Finally, it is argued that the verdict was not responsive to the evidence because the assessment of damages was on the basis of the value of about 14 3-4 cents per dozen and there is no evidence to support such valuation. Evidence of market value is opinion evidence and as such is but advisory. And if this were not so, we would say the facts and circumstances in proof will support the inference that the eggs were of the value assessed by the jury. It is true the actual sales made that day ran from 15 to 15 1-2 cents per dozen, but the quantities were small compared with the quantity involved in this transaction and witnesses say very plausibly that prices would have been lowered a little for heavy purchases. And, further, it is fair to assume that the terms of the contract which gave the defendant the privilege of using second-hand cases might have had some influence on the price a vendor would have put on nine cars of eggs. The jury were entitled to use their own judgment and common knowledge of the subject within reasonable evidentiary limits and we find no suggestion in the verdict of the employment of any improper method or rule in the assessment of damages. Our conviction is that the jury went to the heart of the case and without being deceived by the stratagems of either party, reached a correct solution.

The judgment is affirmed. All concur.