## LOUISVILLE SOAP CO. v. TAYLOR et al.*

(Circuit Court of Appeals, Sixth Circuit. March 17, 1922.)

No. 3593.

**I. Sales ⬤⟿71(5)—Maximum and minimum quantities held not estimate on sale to fill buyer's requirements, and buyer must pay for minimum received.**

In a contract for the sale of defendant's requirements of rosin for a year, 20,000 barrels minimum, 40,000 maximum, followed by a provision giving the seller the right to elect whether to furnish any requirements in excess of the maximum, the minimum and maximum quantities stated

---

⬤⟿For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

*Certiorari denied 257 U. S. ——, 42 Sup. Ct. 586, 66 L. Ed. ——.

are not mere estimates, and the defendant can be required to take and pay for the minimum quantity regardless of its requirements.

**2. Sales ☞77(1)—Facts held to show no closing price on market during portion of contract period.**

Where, under a contract to purchase rosin, it was to be paid for at a stated price above the official closing Savannah market, which was intended to be the official closing price posted by the Savannah Board of Trade, and it appeared that under the rules of that Board of Trade the official price could be determined only from actual transactions between factors and buyers, and that during the last two months of the contract period there were no sales on which the closing price could be based, *held* that there was no closing price within the meaning of the contract, though during that period the committee posted the closing price as determined by the last sale.

**3. Sales ☞84—Contract unenforceable when there is no closing price on market to determine price.**

Where the price of goods sold was to be determined by the official closing price of a Board of Trade on the day order was received, and during the last part of the contract period there was no closing price in that market, so that the contract price could not be determined, both parties were relieved of their obligations under the contract.

**4. Sales ☞77(1)—Buyer held bound by payments after there was no market to fix the price.**

Where buyer of goods under a contract fixing the price by the official closing price on the Board of Trade ordered and received some of the goods after there was no closing price, though the last price determined by actual sales was daily posted as the closing price, and seller made no misrepresentations which would prevent the buyer from ascertaining the true facts in regard to the posted closing price, the payment for the goods in accordance with the posted price was an acceptance of such price as conforming to the contract requirements, and the buyer could not thereafter recover such payments.

In Error to the District Court of the United States for the Western District of Kentucky; Walter Evans, Judge.

Action at law by Thomas J. Taylor and others, partners doing business under the firm name of Taylor, Lowenstein & Co., against the Louisville Soap Company, to recover damages for a breach of contract for the purchase of rosin, in which the defendant filed a cross-petition to recover overpayments made by it. Judgment for plaintiffs and defendant brings error. Reversed and remanded for new trial.

Charles G. Middleton, of Louisville, Ky. (Edward P. Humphrey and Humphrey, Crawford & Middleton, all of Louisville, Ky., on the brief), for plaintiff in error.

John C. Doolan, of Louisville, Ky. (Trabue, Doolan, Helm & Helm, of Louisville, Ky., on the brief), for defendants in error.

Before KNAPPEN, DENISON, and DONAHUE, Circuit Judges.

DONAHUE, Circuit Judge. Taylor, Lowenstein & Co. brought action in the District Court for the Western District of Kentucky against the Louisville Soap Company to recover damages for breach of contract of sale by plaintiff to defendant of a quantity of standard quality grades G, H, and I rosin. The defendant's cross-petition is based upon its construction of this contract in reference to price, and seeks to recover payments in excess of the contract price.

The record presents but two questions: First. As to the quantity of rosin covered by the contract. Second. The price to be paid therefor.

The provision of the contract in reference to quantity is as follows:

"Louisville Soap Company's requirements from April 1, 1918, to March 31, 1919, 20,000 round barrels minimum, 40,000 round barrels maximum. Should buyer's requirements be for more than the maximum amount stipulated herein, orders for such excess are to be submitted to seller. If seller cannot supply, buyer will be privileged to buy such excess elsewhere."

The provision in the contract with reference to price is as follows:

"To be 50c. per 280 lbs. over the official closing Savannah, Ga., market on date' order is received at Mobile, Ala. In the event of two closing prices, the average is to apply." ·

Under this contract the soap company ordered and received, within the year, 12,989 round barrels of rosin, for which it paid in full, and which amount constituted its entire requirements. Taylor, Lowenstein & Co. brought this action to recover damages for the failure of the soap company to take 7,011 round barrels, the difference between the amount it did actually order, receive, and pay for, and the minimum amount of 20,000 round barrels specified in the contract.

It is the contention of the soap company that this is a requirement contract, and that the provision "20,000 round barrels minimum, 40,000 round barrels maximum" is a mere estimate of the amount of rosin it would require from April 1, 1918, to March 31, 1919, and that therefore it was not obligated by this contract to take any rosin in excess of its actual requirements; that the provision in the contract that it was to pay the plaintiff the market price, to be determined by the official closing of the Savannah, Ga., market on date order is received, instead of a fixed, definite, and certain contract price to be paid, regardless of the market price, further evidences the intentions of the parties that the actual requirements of the soap company was the dominant provision of the contract as to quantity.

It is the claim of Taylor, Lowenstein & Co. that the soap company was required by this contract to accept and pay for this minimum amount of 20,000 round barrels, regardless of its requirements, and as many more barrels as it required for use in its factory; that the provision in reference to requirements applied only to the difference between the minimum 20,000 round barrels and the maximum 40,000 round barrels, which maximum quantity Taylor, Lowenstein & Co. obligated itself to furnish the soap company if the requirements would amount to so° many barrels, and if the soap company's requirements exceeded the maximum amount then it had the right to elect whether or not it would accept or reject any orders in excess thereof.

[1] At first glance there would seem to be an irreconcilable conflict between the authorities cited by opposing counsel in support of their respective claims. However, a careful study of these cases discloses that each was decided in reference to the particular contract involved, or, as said by Mr. Justice Holmes in Smoot v. U. S., 237 U. S. 38, 35 Sup. Ct. 540, 59 L. Ed. 829, upon a consideration of the "obviously dominant measure of quantity" in each contract. In the case of Braw-

ley v. U. S., 96 U. S. 168, 24 L. Ed. 622, the estimated amount was 880 cords of wood, more or less, but the contract later specifically provided that the exact requirements of the United States should be determined by the post commander. The court in that case held that this later provision was the dominant measure of quantity.

In the case of Marx v. American Malting Co., 169 Fed. 582, 95 C. C. A. 80, this question was a much closer one, but the court held in that case that the extrinsic evidence, offered to aid the court in correctly interpreting the somewhat uncertain and ambiguous language of the contract in this respect, was sufficient to show that it was the intention and purpose of the contracting parties that requirements, and not the estimate, should control.

In Smoot v. U. S., supra, the contract provided for 140,200 cubic yards, more or less, of filter sand, for a specific construction of 29 filter beds. It appeared from the contract itself that the quantity mentioned therein was approximate only. It was insisted, however, upon the part of the United States, that a letter written by the government engineer, subsequent to the contract, specifically fixed the quantity at 151,000 yards. This, however, did not allow for shrinkage, and the actual requirements of the government were 179,231 cubic yards. The Supreme Court held that a letter from the government engineer in charge of the construction, to a contractor, who had entered into a written contract with the United States to furnish material at a specified price, could not modify the original contract or constitute a new one; that under the terms of the original contract the amount named therein was clearly an approximate amount only; and that the needs of the government for this particular construction was the obviously dominant measure of the quantity to be furnished.

In the case of National Publishing Co. v. International Paper Co. (C. C. A.) 269 Fed. 903, the defendant agreed to furnish to the plaintiff "the entire supply of half-tone newspaper required to print rotogravure supplements * * * during the period of one year, * * * estimated at 400 tons." It is clear that in this case 400 tons was merely an estimate, and not intended by either party as the actual measure of quantity. This is equally true in reference to the contract involved in Kenan, McKay & Spier v. Yorkville Cotton Oil Co., 260 Fed. 28, 171 C. C. A. 64, which provided for the "season's output of linters, about 400 bales." The court in that case held that "about 400 bales" was clearly an approximate amount and that the provision "season's output of linters" was the dominant measure of quantity.

The contract here under consideration does not suggest that the minimum and maximum amounts named therein are merely estimates. On the contrary, from the substantial difference between the minimum and maximum, it would appear that the parties intended that the requirements should control between these two amounts, but should be neither more than the maximum nor less than the minimum. In fact it is specifically provided that, if the requirements should exceed the maximum quantity named, the seller should not be obligated to furnish the same, except at its option. This maximum of 40,000 round barrels is, by the terms of the contract itself, specifically fixed as the

limit of the seller's liability to furnish. It is therefore a definite controlling quantity and not a mere estimate. It would seem absurd to say that the contracting parties should have intended that the maximum should be the dominant measure of quantity as to the seller's obligation to furnish, but that the minimum should not be the dominant measure of quantity as to the buyer's obligation to take.

The language of this contract is identical with the language of the contract involved in Diamond Alkali Co. v. Ætna Explosives Co., 264 Pa. 304, 107 Atl. 711, 7 A. L. R. 495, in which case the contract provided, in reference to the quantity, "Buyer's entire requirements during 1916; minimum quantity 180 tons per month and maximum 250 tons monthly." In that case the court held:

"The minimum and maximum quantities fixed in the contract were not merely probable estimates of the quantities which the appellant was to take, as was the case in Marx v. American Malting Co., 169 Fed. 582, one of the authorities relied upon by learned counsel for appellee, but were definitely fixed quantities which the appellant could demand and the appellee was required to deliver."

In the case of Staver Carriage Co. v. Park Steel Co., 104 Fed. 200, 43 C. C. A. 471, the contract as to quantity provided:

"All the tire steel, of good and suitable quality, which will be used in buyer's works prior to September 1, 1899, not to exceed 14,000 sets, nor to be less than 10,000 sets."

The court held that this was a valid and binding contract within the different amounts specified; that the buyer was obligated to furnish at least the 10,000 sets and as many more up to 14,000 sets as was actually needed for use in the buyer's work prior to September 1, 1899—citing in support of this construction National Furnace Co. v. Keystone Mfg. Co., 110 Ill. 427; Minnesota Lumber Co. v. Whitebreast Coal Co., 160 Ill. 85, 43 N. E. 774, 31 L. R. A. 529. See, also, Staver Carriage Co. v. Park Steel Co., 220 Ill. 412, 77 N. E. 174.

In the case of Budge v. United Smelting Company, 104 Fed. 498, 43 C. C. A. 665, the contract required the seller to furnish "all the mining timbers required and used at buyer's mine, about 600 pieces of the larger dimensions and about 15,000 pieces of the smaller dimensions." The court held that this was a distinct promise to receive and pay for about 600 pieces of one kind of timber and 15,000 of another. The qualification imported by the word "about" is not such as to admit of any material variation from the quantity named. The court also distinguished this case from the case of Brawley v. U. S., supra, upon the theory that the determining words of the contract are the quantities of timber which are specified in the defendant's promise to pay, and not the words "all mining timbers required and used."

In the case of Highlands Chemical Co. v. Matthews, supra, the contract required the seller to deliver to the buyer, if required by him, 10,000 carboys of oil of vitriol, the defendant to take at least 7,000 carboys during the same time. In that case it was held that the defendant was bound to take the minimum amount, whether he needed it or desired it for the purposes of his business or not; and the correlative obligation rested upon the plaintiff to deliver any amount within the

maximum fixed by the contract, if the buyer's needs required the same. In this case, however, the minimum of 7,000 carboys and the maximum of 10,000 carboys are so obviously the "dominant measure" of quantity that it is not materially helpful in the construction of the contract here involved.

It is insisted upon the part of the soap company that, if the minimum and maximum named in this contract should be held to be the measure of the quantity to be furnished thereunder, it would take all the meaning out of the further provision of the contract in reference to the company's requirements. On the contrary, such a construction would give full force and effect to both these provisions in relation to quantity for there is still a large scope for the operation of the provision as to requirements, between 20,000 and 40,000 round barrels. On the other hand, if the company's requirements were to be construed as the absolute measure of quantity, then the provision as to minimum and maximum quantity would be meaningless.

For the reasons above stated, it is the conclusion of the court that this contract required the buyer to accept and pay for 20,000 round barrels minimum and required the seller to furnish that amount and any amount in excess thereof, up to 40,000 barrels maximum, limited in that respect only by the buyer's needs.

The question as to the price to be paid for these grades of rosin requires an examination of the entire record in this case. It is the claim of the soap company that for the last two months covered by this contract, during which time this 7,011 barrels should have been ordered, there was no market on the Savannah Board of Trade, official or otherwise; that there was no other way of fixing the price, and therefor the contract must fail as to this period of the contract. It appears from the evidence that the official closing of the Savannah, Ga., market, named in the contract, was understood by both parties to mean the posted official closing of the Savannah Board of Trade, which seems to be an organization of the naval stores trade, controlled by those interested in the rosin and turpentine business; that under by-law 15 of that organization the naval stores quotation committee is composed of three factors and three buyers. This rule further provides that this committee on quotations shall not consider any unwritten rule or custom that may have heretofore prevailed regarding the posting of quotations or the recognizing of sales; that the quotations posted shall at all times reflect the true and actual conditions of the market, both as to price and tone, and be conservative; that actual transactions, between factors and buyers only, should be taken into consideration. Sales from a buyer to a buyer, from a buyer to a factor, or from a factor to a factor, or to a buyer from a buyer through a factor, should not be reported or considered. This rule further recommends to the quotation committee suggestive adjectives to be used as descriptive of the tone of the markets. Among these suggestions are "strong," "firm," "steady," "quiet," "weak," "dull," "nominal," "nothing doing"; the word "nominal" meaning "where prices do not reflect true conditions"; the words "nothing doing" meaning "absence of transactions for a period sufficient to demonstrate that there is no reasonable basis on which to post quotations."

Rule 6 provides that bids for rosin offerings shall be opened and declared on at 3 p. m. each day, and sales shall be reported at 3:30 at the Savannah Board of Trade, except on Saturdays, when the hours shall be 11:30 a. m. and 12 m. All offerings of rosin which shall not be sold at 3 p. m. (Saturdays 11:30 a. m.) may be sold during the business hours of the succeeding day up to 3 p. m. (Saturdays 11:30 a. m.). Rule 18 further provides that at 3:30 daily, except Saturdays, and 12 m. on Saturdays, the board on which sales are posted being down, the secretary shall inquire of the representatives of the factorage houses present on the floor if there are any sales to be reported; after a sufficient length of time has elapsed for answers to be made, he shall place the board back in its usual position and no further report of sales will be posted or recognized; that the committee on quotations of naval stores shall arrive at a decision as to quotations after said "report or sales board" has been placed back in position, and instruct the secretary to post same.

It further appears from the evidence that there were no sales of rosin of any grade made upon this market between January 22d and April 11th, but that nevertheless the closing price on January 22, 1919, was posted by the committee on quotations from day to day until the 11th day of April; that on January 22d the tone of the market was posted, "Steady; without sales." On January 24th it was posted, "Quiet; no sale." On January 25th it was posted, "Dull; no sale." On January 28th it was posted, "Nothing doing," and this same posting was continued up to and including February 24, 1919, during all of which time the quotation committee posted quotations on G, H, & I. rosin at $13.25, $13.30, and $13.65 respectively. From February 25, 1919, up to April 10th, the tone of the market was posted as "Nominal; sales none." The witness Hatch, manager of the domestic sales department of the London & Savannah Naval Stores, which company dealt in rosin and turpentine, testified that the quotation committee should be governed by actual sales, that between January 22d and April 1st there was no official market, and that the quotations posted during this time represented the closing price of rosin on January 22d, and not the official closing on the days they were posted, and that these figures did not represent the actual condition of the market on these dates. The witness Purse, secretary of the Savannah Board of Trade, testified that the quotation committee, under the rules, take into consideration actual sales only, and that the quotations posted after January 22d until April 11th were simply posted as representing the last sales.

It is, however, wholly unnecessary to consider the evidence of these witnesses in order to determine, from the by-laws of the Savannah Board of Trade, what is and what is not "official closing" of that market within the purview of this contract.

[2] The condition of the market on the Savannah Board of Trade during the period mentioned was wholly an anomalous one. Ordinarily the trade in rosin upon that market was such as to justify a reasonably accurate quotation of the market prices of this commodity, and evidently that had been the usual condition that had obtained on this market for such a length of time that the parties to this contract relied upon its continuance. In any event they must be held to have contemplated

the by-laws of that organization, which provide that the quotations posted should at all times reflect the true and actual condition of the market, both as to price and tone. It further appears that the committee on quotations were required to take into consideration only actual transactions between factors and buyers, and that at the close of business on each day it was required to obtain a report of the sales made, and, after these reports, arrive at a decision as to quotation. From January 27th to and including February 24th, the tone of the market was posted as "Nothing doing," meaning according to rule 15, "Absence of transactions for a period sufficient to demonstrate that there is no reasonable basis on which to post quotations." It is true, perhaps, that lack of actual transactions for a day or two, and especially of these grades of rosin, might not affect the otherwise arbitrary power of this committee on quotations; but the absence of transactions for a period sufficiently long to demonstrate to the satisfaction of the quotation committee that there was no reasonable basis on which to post quotations would not justify that committee in posting an imaginary official closing, that wholly failed to reflect the true state of the market. That this committee had reached the conclusion that the absence of transactions had continued for such a length of time that there was no reasonable basis on which to post quotation is evidenced by the fact that for substantially one month they posted the tone of the market as "Nothing doing," and for more than a month after that posted the tone of the market as "Nominal; no sales." Commission Co. v. Aaron, 145 Mo. App. 307, 130 S. W. 116.

There is no evidence in this record tending to explain why the words "Nothing doing," that had been posted as indicating the tone of the market from January 27th to February 24th, should have been changed on February 25th to "Nominal; sales none," or why that should have been continued up to and including April 10th, for it is undisputed in the evidence that the same condition continued after February 24th to April 10th as had existed from January 27th up to and including February 25th. In fact, the official posting shows there were no sales. Under by-law 15, the word "nominal" should be used only where prices do not reflect true conditions; but where there are no sales at any price, "Nothing doing" is, under this by-law, the proper designation for the tone of the market. However, that may be, it is not vitally important, in view of the admitted fact that during all of this time there were no transactions in any kind of rosin that would furnish a reasonable basis for posting an official closing, at least from and after January 27th until April 11th.

The presumption naturally and necessarily obtains that the contracting parties contemplated prices fixed in the usual and ordinary way, based upon actual transactions on the Savannah market. Prices that would reflect the true condition of the market generally, and not the closing price of January 22d, which in this case happens to be largely in excess of the actual market price in Savannah, outside the transactions in that commodity on the Board of Trade.

Our attention is called to the case of Union Naval Stores Co. v. Patterson, 179 Ala. 525, 60 South. 807. It is claimed that the question

there involved is identical with the question in the instant case. It does not appear from the opinion in that case that there was an absence of sales for any considerable number of days. On the contrary, it appears that it was only on an occasional day, now and then, when no sales were reported. As already stated, absence of sales for a day or two, and particularly of these grades of rosin, would not necessarily deprive the quotation committee of a reasonable basis for arriving at a quotation that would fairly reflect the market both as to tone and price. It further appears, from the report of that case, that it was not contended that the quotation committee had not posted the quotations "in accordance with its previous customs." By-law 15 expressly provides that the committee on quotations "shall not consider any unwritten rule or custom that may have heretofore prevailed regarding the posting of quotations or the recognizing of sales." It does not appear from the record just when this by-law was adopted. Certainly it was not in force when the Patterson Case was decided by the Alabama court; otherwise, it is not probable that court would have referred to previous custom as one of the reasons for the conclusion in that case. It is altogether possible that this by-law was later adopted in order to avoid the effect of that decision; but regardless of when this by-law was adopted, and regardless of whether the Alabama court overlooked the same, it is clear from its provisions that the committee on quotations must be guided and controlled, not by a previous custom, but wholly by the terms and provisions of the by-law itself.

From the uncontradicted evidence in this case the conclusion necessarily follows that, under by-law 15 of the Savannah market, the quotation committee was not authorized to post an official closing price when there was no reasonable basis upon which to post quotations; that after January 27th, until April 11th, the fact, as declared by the committee, that there was "nothing doing," followed by the immaterial change to "nominal," demonstrates that there was no reasonable basis on which to post quotations; that the price posted by the quotation committee during this time was not the closing price on either of these days; that the quotations posted did not reflect the true and actual condition of the market as to price from January 27th until April 11th, and did not reflect the true and actual condition of the market as to either tone or price after February 24th until April 11th; that at the time of the execution of the contract sued upon the contracting parties did not contemplate the fixing of prices by the quotation committee on any basis other than the actual transaction between factors and buyers, nor did they contemplate any such long-continued anomalous condition of the Savannah market as would prevent the quotation committee from fixing a price, based upon actual transactions, that would at all times reflect the true and actual condition of the market price; that from the 27th day of January, 1919, there was no "official closing Savannah, Ga., market," within the meaning of the contract, upon any day subsequent to that date until after the end of the year covered by the contract, March 31, 1919; that from and after January 27, 1919, the provision in the contract as to price fails, because indefinite and uncertain, and no longer possible of ascertainment by the means or method provided in the contract or in any other way.

[3] Where there is a contract to sell goods at a price, or on terms, to be fixed by a third person, this express condition qualifies the obligations of both buyer and seller; and where such third person, without fault of the seller or the buyer, cannot or does not fix the price or terms the seller is released from his obligation to sell and deliver, and the buyer is released from his promise to accept and pay. This doctrine has been universally applied by the courts not only to contracts of sale, but to many other forms of contract, and it has also been written into the Uniform Sales Act adopted by many states of the Union. Therefore the motion of the defendant for a directed verdict as to plaintiff's cause of action should have been sustained.

[4] There is no allegation in the cross-petition of fraud, deceit, or misrepresentation by the plaintiff by which the defendant was induced to pay the invoice price of the rosin shipped it on February 18 and 20, 1919, nor is there any allegation in this cross-petition that the defendant at that time did not know or have the means of knowing the actual condition of the Savannah market further than the averment to the effect that since February 20, 1919, it has learned that there was no official closing Savannah market at that time. That condition of the Savannah market had existed from January 27th, and it would seem that this was a sufficient time for the defendant, using due diligence, to inform itself in reference to this important provision of its contract in reference to the price to be paid therefor. The invoice presented to the defendant the plaintiff's claim as to the closing price of the Savannah market, but the plaintiff made no representations whatever that would induce the defendant not to investigate that price for itself. It accepted the rosin and paid the invoice price without protest. Under these circumstances the defendant must be held, as to these two transactions, to have accepted the prices posted by the quotation committee, and demanded by plaintiff, as the price it was to pay for this rosin under its contract.

For the reasons above stated, the judgment of the District Court is reversed, and the cause remanded for a new trial in conformity with this opinion.