MUNSON S. S. LINE v. GRIMWOOD et al.

(Circuit Court of Appeals, Second Circuit. January 16, 1918.)

No. 89.

1. SHIPPING ⬤⇒108—BREACH OF CONTRACT—TONNAGE FOR CARRIAGE OF COAL —DAMAGE.

Plaintiff firm was a dealer in coal at Mexican ports, and prior to 1912 had made shipments on vessels of defendant steamship company. At that time the parties entered into a contract by which defendant, for a term of three years from January 1, 1913, agreed to furnish vessels for carrying all the coal shipped by plaintiff, which was to be sent from certain ports of the United States at specified rates of freight. Shipments were made during the first part of 1913, when, owing to the unsettled political and business conditions in Mexico, plaintiff ceased further shipments and suspended its business, except for the sale of coal on hand. In 1915 plaintiff demanded five ships under the contract, which were refused. It made no effort to obtain transportation by other vessels and practically abandoned further shipments. *Held*, in an action for breach of the contract, that an instruction that plaintiff was entitled to recover as damages the difference between the contract rate and the current rate of freight was erroneous; that, assuming the validity of the contract, in the absence of evidence of loss in plaintiff's business, resulting from its breach, and the amount of such loss, there was no basis for the recovery of substantial damages.

2. CONTRACTS ⬤⇒175(1)—CONSTRUCTION—PREVIOUS COURSE OF BUSINESS.

It is presumed that, in making such contract, the parties contracted with reference to the quantity of coal reasonably required by plaintiff to carry on its established business.

In Error to the District Court of the United States for the Southern District of New York.

Action at law by Adolfo Grimwood and Fernando Cavallo, copartners doing business as A. Grimwood & Co., against the Munson Steamship Line. Judgment for plaintiffs, and defendant brings error. Reversed.

The defendants in error (hereinafter called Grimwood) had for a number of years before 1912 an established coal business in Vera Cruz, and perhaps other Mexican ports. They evidently had dealt with plaintiff in error (a steamship company, hereinafter called Munson) for some time before 1912, by obtaining transportation for American coal to Mexico. At the trial, Grimwood attempted to show the history of his relations and the extent of his dealings with Munson prior to the date of written contract sued on (July, 1912), but was prevented by the court. At the time just stated, the parties hereto made an agreement, of which the following is the important part: "[Munson] agrees to receive and transport by steamers, and [Grimwood] agrees to furnish for shipment from Baltimore, Md., Newport News, Norfolk, or Sewell's Point, Va., to Vera Cruz, Tampico, or Puerto Mexico, Mexico, all

---

⬤⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

of the coal and coke shipped by [Grimwood] from January 1, 1913, to December 31, 1915, for any of the voyages mentioned above; it being understood that [Grimwood] is not to ship coal or coke from any other United States port outside of Baltimore, Md., Newport News, Norfolk, or Sewell's Point, Va., to Vera Cruz, Tampico, or Puerto Mexico during the period mentioned above." Steamers were to be supplied on 10 days' notice, were not to exceed 5,000 tons coal cargo capacity, ports of loading and discharge were to be designated, and, if Grimwood called for more than 4,000 tons to be carried at one time, Munson could supply two steamers in response thereto. Freight rates were specified, which varied with the port of destination, and the number and capacity of the ships furnished.

Grimwood shipped some coal by Munson's steamers between January and June, 1913. By that time the political and business conditions in Mexico were such that he deemed it best, as he said, to ship no more, and "peddle out" what he then had at Vera Cruz, about 12,000 tons. He remained of this mind until March, 1915, when he notified Munson that he "required a steamer to load at Baltimore for Vera Cruz," not stating any intended tonnage. Munson refused to furnish one. Nothing further was done until November, 1915, when the United States recognized Carranza as "first chief" of a de facto government in Mexico, and Grimwood (as he says) felt that it was time to send more coal, wherefore he demanded four steamers, each to carry "approximately 4,000 to 5,000 tons," and to be ready to load at divers times specified, but all before December 31, 1915, the expiration date of contract. Munson again refused, and this action was begun in February, 1916, alleging large, but not specifically described, damages for breach of the contract of 1912; i. e., for refusal to furnish tonnage in 1915.

It appeared on the trial that Grimwood had made no effort to get transportation by any other vessels, that he had sent no coal whatever to Mexico after Munson's refusals, except some from Alabama by rail, much of which had been seized in transit by some alleged governmental Mexican authority, after which experience he had abandoned the effort. There was no evidence of any sales or attempted sales of coal by Grimwood in Mexico in 1915, other than the "peddling" aforesaid; but there was testimony of high and advancing prices for coal in Vera Cruz at that time, and of great advances in freight rates for water carriage after the outbreak of the European War in 1914.

The answer of Munson pleaded, in effect, that the so-called contract was invalid, and no contract in law, and had been abandoned by Grimwood. At the close of plaintiff's case, motion was duly made to dismiss, because there was no proof of damages, and such motion was repeated when both parties rested. The court, however, held as matter of law that the contract was valid, left the defense of abandonment to the jury, and instructed them that plaintiff's measure of damages, if in good faith he intended to ship the large quantities of coal, for which he demanded tonnage, was the difference between the contract freight on five shipments, of 4,000 tons each, and current freight on the same quantities at the times of the above stated demands, together with interest from the demand dates.

The jury returned a verdict for Grimwood for $45,000 and interest. To the judgment thereon Munson took this writ.

Kirlin, Woolsey & Hickox, of New York City (J. Parker Kirlin, John M. Woolsey, and Harry D. Thirkield, all of New York City, of counsel), for plaintiff in error.

Kellogg, Emery & Cuthell, of New York City (Frederick R. Kellogg, and Earle L. Beatty, both of New York City, of counsel), for defendants in error.

Before WARD, ROGERS, and HOUGH, Circuit Judges.

HOUGH, Circuit Judge (after stating the facts as above).  [1] This cause was submitted to the jury under a theory of damages so

unsuited to the facts developed by the evidence that a new trial is necessary. Damages are either compensatory or punitive; in this action on contract the latter may be disregarded; so that this plaintiff is necessarily represented by the jury's action as having been compensated by this verdict for some loss or injury. This is a result imposed by law, which also forbids any verdict for more than nominal damages, when there is no lawfully proven pecuniary loss for which to award compensation.

The substance of the argument in support of the judgment below, is that the parties were dealing in a commodity; i. e., tonnage. Grimwood was entitled to get it from Munson, who unlawfully refused the demand; therefore Grimwood was properly awarded the difference between what he had agreed to pay Munson for it, and what it would have cost to get it elsewhere at the time of demand, irrespective of whether he got it or not, provided only he made the demand in good faith—i. e., apparently with a real intent to ship coal.

Tonnage is in a sense a commodity; so are railway and theater tickets, and many other things, which may or may not be directly productive of losses. If one buys tickets or tonnage to sell again, the profit or loss in such dealings is computable as if coal or grain or any other objects commonly bought and sold were the subject of bargain. But ordinarily the right of carriage or admission is an incident or preliminary to gain from that which is transported, or intellectual pleasure from that which may be seen or heard.

In this case, if Grimwood had actually sent coal to Mexico at an expense greater than Munson's price, there would have existed an actual expense, actually incurred, and requiring compensation on a familiar basis, without any regard to the ultimate fate of such Mexican coal venture. But this contract was (if valid at all, and by the very argument on its behalf) to supply the requirements of Grimwood's established business in respect of getting, for purposes of sale, American coal into Mexico; that is, what tonnage he could demand depended on the requirements, and the reasonable requirements, of an actual business. It did not depend on how much tonnage Grimwood wanted to take a risk on. For all that this record shows, instead of demanding four ships in November, 1915, 40 might have been called for.

Still less was it within the contemplation of the parties that Grimwood, without any proof of business destroyed by Munson's refusal, should collect as his damages for not getting coal, any part of the sums he did not pay for transportation. We assume that there was a real desire to send 20,000 tons of coal in one month to a market and a business that had not absorbed over 12,000 tons in two years; but there was no proof at all that such a procedure was a reasonable requirement for the business, either at the time when demand made, or at the date of contract. The relations between the parties as evidenced by the contract, and regarding that agreement as a "requirement" contract, were such that tonnage was for them not a commodity, like coal, but a service. Damages did not and could not flow directly from a refusal to transport coal, but only from the effect of such re-

fusal on the business of selling coal, and Grimwood's particular business of that nature.

It is quite possible that, during Mexico's period of especial anarchy, Grimwood had kept together a business of sorts, equally possible that what he had was ruined, or its rehabilitation prevented, by not getting coal in November and December, 1915; yet it is also not only possible, but on this record apparent, that he has been awarded a very large sum of money, not because he showed any loss, but solely because he was willing to risk some shipments to a region of which the business capabilities in 1915 are not shown at all. He has paid out nothing, and been rewarded for abandoning a risk; this is mere gambling. Loss in the business with reference to which the parties contracted must be shown. How that can or will be done cannot now be laid down. It depends on evidence not yet adduced; but there must be shown a loss in Mexico. The present verdict represents nothing but an absolutely unearned profit for not sending coal to that distracted country.

[2] The fundamental question in this case, whether the writing of July, 1912, is a "requirement" contract, or an unenforceable and illegal promise to obey the will or whim of Grimwood, we cannot decide on this record, with fairness to plaintiff below. As stated above, he was prevented from showing dealings with Munson before 1912; we do not know whether by such evidence the quantity of tonnage needed can be reasonably ascertained. It is presumed that "the intention of the parties, was to contract in reference to such quantity." This quotation is from our decision in Manhattan, etc., Co. v. Richardson, etc., Co., 113 Fed. 923, 51 C. C. A. 553, a case which as far as it goes still represents our views on this subject; whether it will cover this case, when presented by proper evidence, we cannot tell.

We may add, however, that, had no offer to show the extent and nature of Munson's previous knowledge of Grimwood's requirements been made, and the trial court had held the contract a "will, wish, or want" agreement, we should have agreed with such ruling on the Manhattan Case, supra, and the judgment of Sanborn, J., in Coldblast, etc., Co. v. Kansas City, etc., Co., 114 Fed. 77, 52 C. C. A. 25, 57 L. R. A. 696, which fully and ably covers the subject, so far as it can be divorced from facts peculiar to each transaction.

In so far as the language of decision in Ramey, etc., Co. v. Schroeder, etc., Co., 237 Fed. 39, 150 C. C. A. 241, seems to assert that an agreement otherwise void, as depending for effect on the will, wish, want, or whim of one party, is validated merely by the promise of such party to abstain from dealing in respect of the subject in hand, with any person other than the second party, we are compelled to think it inadvertently used, and to disagree.

Judgment reversed, and new trial awarded.