ROBERTSON v. MILLER, Alien Property Custodian, et al.

(Circuit Court of Appeals, Second Circuit. December 28, 1922.)

No. 94.

1. War ⬅12—Damage from breach of commercial contract is "debt" within Trading with the Enemy Act.

The damage resulting from the breach of a commercial contract is a "debt" within Trading with the Enemy Act Oct. 6, 1917, § 9 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115½e), permitting any person to whom such debt is owing by an alien enemy to recover it from the funds of the alien enemy in the hands of the Alien Property Custodian.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Debt.]

2. Sales ⬅369—Action for debt will lie where amount can be liquidated by calculation.

An action for debt will lie where the amount sought to be recovered is certain or can be ascertained from fixed data by computation, such as the damage resulting from a breach of contract of purchase of goods, which is the difference between the resale price of the goods and the contract price, though the latter is determined by market quotations.

3. Contracts ⬅10(4)—Sale of all ore mined is mutual and supported by consideration.

A contract by a mining company to sell all the ore mined by it, containing a stated percentage of zinc, during a prescribed period, requires the company to proceed in good faith with the mining of the ore, so that the obligations of the parties are mutual, and there is sufficient consideration for the promise of the buyer to pay the contract price for the ore.

4. Equity ⬅65(3)—Other transactions held not to render hands of seller unclean.

A mining company which contracted to sell the output of its mine is not precluded from its remedy in equity against the funds of the buyer in the hands of the Alien Property Custodian, under the maxim requiring him to come into equity with clean hands, because the corporation to which the seller company was subsidiary had made another contract to sell the ore.

5. Appeal and error ⬅984(2)—Allowance of interest by court of equity not reversed except for clear abuse of discretion.

The Circuit Court of Appeals will not interfere with an award of interest made by the trial court sitting in equity, unless there has been a clear abuse of discretion.

6. Interest ⬅19(2)—Not allowable where damages are unascertainable at commencement of action.

No interest can be allowed at law where the damage is uncertain or unascertainable by computation at the time of the commencement of the action.

7. Interest ⬅19(2)—Allowable where damages can be ascertained by computation.

Interest may be allowed where it can be determined what amount is due, either by mere computation or by computation from established market values or other generally recognized standards.

8. Interest ☞47(2)—Ineffective service of summons and complaint held sufficient demand to start interest thereon.

The service of summons and complaint upon an agent of defendant corporation, which was subsequently set aside because the court did not have jurisdiction of the defendant, is sufficient demand to start interest running upon a claim for damages for breach of the contract of sale.

9. War ☞12—Facts held to show debt of aliens could have been paid so interest was not suspended by war.

In a suit against the Alien Property Custodian to enforce a debt against an alien enemy, evidence *held* to show that the representatives of the alien enemy in this country had sufficient funds in their hands with which to pay plaintiff's claim before the outbreak of the war, so that interest can be allowed upon the debt during the period of the war.

10. Sales ☞384(4)—Defaulting buyer held entitled to deduction for freight saved by lower invoice price.

Where the freight charges on ore shipments depended upon invoice price, the buyer who breached his contract for the purchase of the ore, which was resold by the seller at a lower price, is entitled to a deduction from the damages sustained by the seller of the difference between the freight rates actually charged on the lower invoice price and the rates which would have been charged if the invoices had been at the contract price.

Appeal from the District Court of the United States for the Southern District of New York.

Suit in equity by Frederick Y. Robertson against Thomas W. Miller, as Alien Property Custodian, and Frank White, as Treasurer of the United States, and against Nathan Sondheimer and others. Decree for plaintiff for part of the debt claimed by plaintiff, and plaintiff and the Alien Property Custodian and Treasurer appeal. Modified and affirmed.

See, also, Robertson v. Garvan (D. C.) 270 Fed. 643.

Stockton & Stockton, of New York City (Chas. W. Stockton and K. E. Stockton, both of New York City, and Alfred Sutro, of San Francisco, Cal., of counsel), for plaintiff-appellant-appellee.

William Hayward, U. S. Atty., of New York City, and Adna R. Johnson, Jr., Dean Hill Stanley, and Lindley M. Garrison, Sp. Asst. Atty. Gen., for defendants-appellants-appellees.

Before HOUGH, MANTON, and MAYER, Circuit Judges.

MANTON, Circuit Judge. We shall refer to the respective parties herein as plaintiff and defendants.

Plaintiff, as assignee of the Mammoth Copper Mining Company of Maine, sued in equity to establish a debt claimed by him and to order the delivery by the defendant, Thomas W. Miller, as Alien Property Custodian, to the plaintiff, of so much of said money and property of the alien enemies herein mentioned as may be necessary to satisfy and discharge said debt with interest thereon and costs. The Alien Property Custodian and the Treasurer of the United States are made parties defendant, as are Nathan Sondheimer, Albert Sondheimer, Leo Werschner, Ludwig Beer, and Emil Beer, who are nonresident alien enemies. The suit is based on section 9 of the Trading with the Enemy Act (40 Stat. 419 [Comp. St. 1918, Comp. St. Ann. Supp. 1919, §

3115½e]) and seeks to recover a debt for breach of a commercial contract. The defendants, Nathan Sondheimer, Albert Sondheimer, Leo Werschner, Ludwig Beer, and Emil Beer, all resided at Frankfort, Germany, and during the war, and before this suit was instituted, their property was seized as alien enemies. A trial was had of the issues raised by the pleadings, and thereafter a special master found the amount of the debt. His report has been approved by the court, and this appeal is taken from the final decree entered thereon. The decree below establishes that the German defendants did wrongfully breach their contract, and the indebtedness due to the plaintiff has been fixed at $257,597.21, with interest amounting to $31,800, and the costs of the action.

The indebtedness arose because of a breach of a contract dated August 26, 1914, but executed on September 29, 1914. By its terms, Beer, Sondheimer & Co. agreed to buy tthe total production of zinc, crude ore, shipped by the seller from its properties in Shasta county, Cal. The Mammoth Company was a going concern and owned a producing mine in Shasta county. The price fixed was governed by the St. Louis price of spelter, which was $5 per hundredweight, the buyer under the contract to pay $19 a ton for the zinc ore and for each rise of 1 cent in the price of spelter above $5 per hundredweight, a credit of 5 cents per ton was to be allowed, while for each drop, a debit of 5 cents per ton was to be made. Quotations were made in the Engineering & Mining Journal for the week of the date of the bill of lading. Provision was made for extra payment of ore containing more than 40 per cent. zinc and also payment for other valuable metals in the ore. Sampling and assaying the ore was fixed by the terms of the contract. It was to continue for one year from the date of the completion of the picking plant. The company contemplated building such a picking plant. In any event, the contract was not to continue for more than 18 months from the date of its execution. The picking plant was completed March 5, 1915, and the first shipment thereafter was made on March 6, 1915, and up to March 11, 1915, the Mammoth Company had produced and shipped 1,448.382 tons of ore for which payment was made at the contract price. The court below found that the Mammoth Company performed the conditions of the contract to be performed by it, and that Beer, Sondheimer & Co. repudiated the contract and breached the same. It was found that the required shipments were in as nearly equal weekly quantities as possible. The repudiation was on the sole ground of an alleged abnormal condition or a claim of a condition arising releasing it from performance on the vis major clause of the contract. It was found below that there was no vis major and that there were no objections to deliveries on the ground that they were not in as near as possible equal weekly quantities. It was found by the master that the assay of the ore was fair and accurate and was reasonably applied by the plaintiff in his calculation of the amount of his claim; also, that the price by the Mammoth Company on the resale of the ore was the best price obtainable in the market.

[1] The first question presented is whether the plaintiff's claim for breach of this commercial contract is a "debt" within the meaning of

the Trading with the Enemy Act. Section 9 of the Act (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115½e) provides:

"That any person, not an enemy, or ally of enemy, claiming any interest, right, or title in any money or other property which may have been conveyed, transferred, assigned, delivered, or paid to the Alien Property Custodian hereunder, and held by him or by the Treasurer of the United States, or to whom any debt may be owing from an enemy, or ally of enemy, whose property or any part thereof shall have been conveyed, transferred, assigned, delivered, or paid to the Alien Property Custodian hereunder * * * may file with the said Custodian a notice of his claim under oath and in such form and containing such particulars as the said Custodian shall require: * * * If the President shall not so order (payment) * * * said claimant may, at any time before the expiration of six months after the end of the war, institute a suit in equity in the District Court of the United States for the district in which such claimant resides, or, if a corporation, where it has its principal place of business (to which suit the Alien Property Custodian or the Treasurer of the United States, as the case may be, shall be made a party defendant), to establish the interest, right, title, or debt so claimed, and if suit shall be so instituted then the money or other property of the enemy, or ally of enemy, against whom such interest, right, or title is asserted, or debt claimed, shall be retained in the custody of the Alien Property Custodian, or in the Treasury of the United States as provided in this act, and until any final judgment or decree which shall be entered in favor of the claimant shall be fully satisfied by payment * * * or until final judgment or decree shall be entered against the claimant, or suit otherwise terminated."

The damage resulting from the breach of a commercial contract is a "debt." It has been so held under statutes for attachments against "debtors" or suits founded on "debts" or "indebtedness." Fisher v. Consequa, 9 Fed. Cas. 120, No. 4816; New Haven Co. v. Fowler, 28 Conn. 103; Showen v. J. L. Owens Co., 158 Mich. 321, 122 N. W. 640, 133 Am. St. Rep. 376. Where the term "debt" is used under the National Bankruptcy Act (section 63 [Comp. St. § 9647] providing debts founded upon an open account or upon a contract expressed or implied), it has been held that a claim for breach of a commercial contract is a debt as in Re Frederick L. Grant Shoe Co., 130 Fed. 881, 66 C. C. A. 78. This court held that a claim for damages against a bankrupt for breach of warranty accompanying a sale of shoes was a debt provable against his estate. Also, a breach of contract to supply ice gives rise to a debt provable in bankruptcy. In re Stern, 116 Fed. 604, 54 C. C. A. 60. See, also, Central Trust Co. v. Chicago Ass'n, 240 U. S. 581, 36 Sup. Ct. 412, 60 L. Ed. 811, L. R. A. 1917B, 580; Clarke v. Rogers, 228 U. S. 534, 33 Sup. Ct. 587, 57 L. Ed. 953; In re Mullings Clothing Co., 238 Fed. 58, 151 C. C. A. 134, L. R. A. 1918A, 539. Under the corporation laws of the states making individual members of a corporation liable for its debts, an unliquidated claim for damages against a manufacturing corporation has been held to be a debt.

"We do not think it admits of a reasonable doubt, that all such claims for damages were intended to be included in the term 'debts.'" Mill Dam Foundery v. Hovey, 38 Mass. (21 Pick.) 417.

See, also, Proctor-Gamble Co. v. Warren Cotton Oil Co. (C. C.) 180 Fed. 543; Green v. Easton, 74 Hun, 329, 26 N. Y. Supp. 553.

In Fisher v. Consequa, supra, Justice Washington said:

" 'The uncertainty of the sum due, does not, in the common understanding of mankind, render it less a debt. A promise, whether express or implied, to pay as much as certain goods or labor are worth, or as much as the same kind of goods may sell for on a certain day, or at a certain market; or to pay the difference between the value of one kind of goods and another, creates, in common parlance, a debt.' "

Also in the statutes regulating "set-offs." Jackson v. Bell, 31 N. J. Eq. 554; Baum v. Tonkin, 110 Pa. 569, 1 Atl. 535; Tompkins v. Augusta, etc., R. Co., 102 Ga. 436, 30 S. E. 992. Also probate statutes. Johnson v. Garner (D. C.) 233 Fed. 756. Also fraudulent conveyances. Woodbury et al. v. Sparrell Print et al., 187 Mass. 426, 73 N. E. 547.

[2] When Beer, Sondheimer & Co., refused to accept and pay for the quantities of ore according to its metallic content, the ore was sold for less than the contract price. This was the best obtainable price as found below. The metallic content of the ore was known as soon as the assays were made. The price was determined by the quotations in the Engineering & Mining Journal and was fixed and definite. The law fixed the damages to plaintiff as the difference between the contract price and the resale price. Thus the calculation was made, and this was found by the master on no materially disputed fact. It was merely subtracting from the amount which Beer, Sondheimer & Co. should have paid for the ore, the amount realized by the Mammoth Company on its resale.

Such an indebtedness is what has been called "practically a liquidated amount." Pratt v. Auto Spring Repairer Co., 196 Fed. 495, 116 C. C. A. 261; Chicago, etc., Ry. Co. v. Clark, 92 Fed. 968, 35 C. C. A. 120. The contract specified that Beer, Sondheimer & Co. were to take the total production of zinc ore at a specified grade over a definite period of time. In United States v. Colt, 25 Fed. Cas. 581, No. 14839, Circuit Justice Washington said that a sum may be liquidated so as to support an action of debt, although it is not fixed in the amount by the contract itself. If the amount is definitely determined by extrinsic circumstances, the sum is liquidated and certain. The Supreme Court said in United States v. Chamberlin, 219 U. S. 250, 31 Sup. Ct. 155, 55 L. Ed. 204:

"Whether an action of debt is maintainable depends not upon the question who is the plaintiff or in what manner the obligation was incurred, but it lies whenever there is due a sum either certain or readily reduced to certainty."

We think the claim here is for a sum certain, such as would form the basis of a suit for debt. Actions for debt will always lie where the amount sought to be recovered is certain or can be ascertained from fixed data by computation. Mills v. Scott, 99 U. S. 25, 25 L. Ed. 294. We think it was not the intention of Congress to place the duty upon the courts of determining the fact of liability without at the same time imposing the duty of finding the extent thereof. They are nearly related, and, once liability is found, the task of finding the extent thereof is not ordinarily difficult. When Beer, Sondheimer & Co. breached the contract and damages were suffered, a debt was created such as is within the purview of section 9 and by virtue of the statute a creditor is entitled to the relief sought.

The defendants seek to avoid the obligations of the contract, contending that it lacks mutuality and is unenforceable for want of consideration. The reason advanced for failing to live up to the terms of the contract was given by Beer, Sondheimer & Co. in its telegram of March 17, 1915, wherein it said that—

"In view of abnormal conditions (business) we will only accept tonnages reasonably equal to the average monthly amount shipped heretofore. We are unable to receive and smelt any further tonnages in accordance with page five of our contract with you. We have advised all other shippers accordingly."

Clause 5 referred to was the vis major clause common to business contracts. No vis major existed which would excuse performance of a valid contract. It was the abnormal conditions which were given as a reason for breaking their contract. Nothing was said then or since, until this appeal, about lack of mutuality. Munson S. S. Line v. Grimwood, 249 Fed. 722, 161 C. C. A. 632; Id. (C. C. A.) 273 Fed. 166, is relied upon in support of the contention that the contract lacks mutuality. It was held in that case that having, at the time of the breach, definitely assigned one reason for the action the defendant could not after defend on a different ground, i. e., lack of mutuality.

[3] By the contract, the Mammoth Company promised to sell, and Beer, Sondheimer & Co. promised to buy at a fixed price, the total production over a definite period of a specified mine owned and operated by the Mammoth Company. For these mutual promises there is ample consideration. In Transcontinental Petroleum Co. v. Interocean Oil Co. (C. C. A.) 262 Fed. 278, a provision for deliveries in quantities of actual production of oil wells was deemed sufficient when attacked for want of mutuality. The court said:

"In effect, the contract bound the plaintiff to deliver the entire output of its wells, up to the quantities specified. No such personal choice or option was given to withhold or refuse deliveries of oil produced by its wells as is sometimes held to destroy the requisite mutuality of contract obligations. The limitation is a physical one, of a kind common in business affairs. When the quantity of a commodity to be delivered or received under a contract of sale rests in the uncontrolled will or desire of one of the parties, mutuality is lacking. It is otherwise when the quantity is measured by the output or requirements of an established plant or business during a limited time."

Where the certainty can be ascertained from the means to be supplied by the future exercise of the business in good faith and in the normal manner of such business, such a commercial transaction does not lack mutuality. Marx v. Amer. Malting Co., 169 Fed. 582, 95 C. C. A. 80. This principle has been applied to contracts that provide for the purchase and sale of the total amounts of given articles needed or required in an established enterprise over a definite period. Texas Co. v. Pensacola Corp. (C. C. A.) 279 Fed. 19; Pittsburgh Plate Glass Co. v. Neuer Glass Co., 253 Fed. 161, 165 C. C. A. 61. An obligation to produce and ship ore in good faith is clearly implied within the terms of this contract. No personal choice or option is given to withhold or refuse deliveries. When the quantity is measured by the output, the Mammoth Company could not, without violating its contract, have

escaped producing and delivering the ore. We find on this record that the Mammoth Company carried out its promises under the terms of the contract. It completed the picking plant by March 5, 1915. This was done with reasonable dispatch. It was on March 17, 1915, that Beer, Sondheimer & Co. repudiated the contract; their obligation was to buy the ore as soon as the picking plant was built. There were mutual promises to sell and buy all its ore containing 33 per cent. or more metallic zinc for a given period and this exclusively during a period of 18 months. There was a promised option given Beer, Sondheimer & Co. to purchase all the other grade zinc ores which the Mammoth Company might purchase. Thus there was sufficient consideration. Munson S. S. Line v. Grimwood (C. C. A.) 273 Fed. 166; Ramey Lumber Co. v. Schroeder Lumber Co., 237 Fed. 39, 150 C. C. A. 241.

[4] It is contended that the plaintiff seeking relief in a court of equity does so with unclean hands, and the claim is that the Mammoth Company had, previously to the making of the contract here in question, made a contract with another buyer for the exclusive sale of all the ore in question. It appears that the United States Smelting Company, with an office in Salt Lake City, was a subsidiary corporation of the United States Smelting, Refining & Mining Company, as was also the Mammoth Company, operating at Kennett in Shasta county, Cal. In June, 1914, the subsidiary company, the United States Smelting Company, made an ore-selling contract with the American Metal Company. It is claimed that this contract covered the ore which was sold by the Mammoth Company to Beer, Sondheimer & Co. The fact appears to be that the contract with the American Metal Company was with the parent company, but the ore sold to Beer, Sondheimer & Co. was sold by a separate corporate entity and the contract was made in good faith, and it is not in conflict with any rights accorded to the American Metal Company by reason of its contract with the parent company. Negotiations with the United States Smelting Company were made on behalf of the Mammoth Company for the sale of the ore in suit with the American Metal Company on two distinct occasions after the contract of June 10, 1914, had been made. Once was before the ore was sold to Beer, Sondheimer & Co., and the other time was after Beer, Sondheimer & Co. had broken its contract and had refused to take the ore in question. We see nothing in these transactions which establishes the claim of mala fides. Further, the United States Smelting Company, being a separate and distinct entity, could not and did not make contracts for the Mammoth Company.

[5-7] The plaintiff appeals, claiming that he is entitled to more interest than allowed him by the court below and also complaining of a deduction made for freight in estimating the damages sustained by him. This suit being in equity, the settled rule of this court is applicable that it will not interfere with an award of interest made by the trial court sitting in equity unless there has been a clear abuse of discretion. Penn Steel Co. v. N. Y., etc., R., 198 Fed. 778, 117 C. C. A. 560. The trial court awarded interest from the 3d day of July, 1919, upon the amount of the damages as found by the master; this being the day when peace was established between this government and Ger-

many. The theory of accepting this date was that because of the state of war existing between this country and Germany, business negotiations were suspended. Interest is awarded as damages, and the Supreme Court has held that the rule of lex fori obtains. Goddard v. Foster, 84 U. S. (17 Wall.) 123, 21 L. Ed. 589. The rule in this circuit is that no interest can be allowed at law where the damage is uncertain or unascertainable by computation at the time of the commencement of the action, or, in other words, where the damages are unliquidated. Stephens v. Phœnix Bridge Co., 139 Fed. 248, 71 C. C. A. 374. But this court has held that in cases where it can be determined what amount is due either by mere computation or by computation in connection with established market values or other generally recognized standards, interest may be allowed. Demotte v. Whybrow (C. C. A.) 263 Fed. 366. In Faber v. City of New York, 222 N. Y. 255, 118 N. E. 609, the state Court of Appeals said:

"The question of the allowance of interest, on unliquidated damages has been a difficult one. The rule on this subject has been in evolution. To-day, however, it may be said that if a claim for damages represents a pecuniary loss, which may be ascertained with reasonable certainty as of a fixed day, then interest is allowed from that day. The test is not whether the demand is liquidated. Was the plaintiff entitled to a certain sum? Should the defendant have paid it? Could the latter have determined what was due, either by computation alone or by computation in connection with established market values, or other generally recognized standards?"

In Insurance Company v. Davis, 95 U. S. 425, 24 L. Ed. 453, a resident of Virginia, who had been, before the war, a local agent of an insurance company, refused to receive the renewal premiums on a policy of insurance tendered him by a resident of that state. His refusal was based upon the ground that he had received no renewal receipts from the company without which he could not receive the premiums, and that the money, if received, would be liable to confiscation by the Confederate government. The evidence failed to show that the company had consented to his continuing to act as such agent during the war or that he did so continue. The policy of insurance had an indorsement on the instrument that "all receipts for premiums paid at the agencies are to be signed by the president or actuary" of the company. This was held to be merely a notice to the assured that he must not pay to an agent or at an agency, without getting a receipt signed by the president or actuary, and it was held that waiving the consideration of any question in regard to the validity of an insurance upon the life of an alien enemy, such tender of payment did not bind the company. The court said:

"We do not mean to say, that if the defendant had continued its authority to the agent to act in the receipt of premiums during the war, and he had done so, a payment or tender to him in lawful money of the United States would not have been valid; nor that a stipulation to continue such authority in case of war, made before its occurrence, would not have been a valid stipulation: nor that a policy of life insurance on which no premiums were to be paid, though suspended during the war, might not have revived after its close. We place our decision simply on the ground that the agency of Garland was terminated by the breaking out of the war, and that, although by the consent of the parties it might have been continued for the purpose of receiving payments of premiums during the war, there is no proof that such assent was

given, either by the defendant or by Garland; but that, on the contrary, the proof is positive and uncontradicted, that Garland declined to act as agent."

[8] On June 29, 1916, after the resale of the goods, the Mammoth Company sued Beer, Sondheimer & Co. in the District Court of Salt Lake county, state of Utah, and served an agent with a summons and complaint. This informed the agents who had theretofore represented Beer, Sondheimer & Co. of the demand of the Mammoth Company. This was set aside for the reason that it was decided the court did not have jurisdiction of the defendants. On the 29th of September, 1916, the plaintiff, as assignee of the same cause of action, brought an action in the Supreme Court of the State of New York in the county of New York against Beer, Sondheimer & Co., and service was made upon their agents. The service of the summons and complaint in the Utah action was a sufficient demand to liquidate the plaintiff's claim, even if unliquidated, and to start interest running thereon. Dwyer v. United States, 93 Fed. 616, 35 C. C. A. 488; Kaufman v. Tredway, 195 U. S. 271, 25 Sup. Ct. 33, 49 L. Ed. 190; United States v. Curtis, 100 U. S. 119, 25 L. Ed. 571; Tuzzeo v. Bonding Co., 226 N. Y. 171, 123 N. E. 142.

[9] At the time of the commencement of these actions, the consequent damages to the plaintiff were complete and could be ascertained as of that particular time and in accordance with the fixed rules of evidence and then known standard of value because of the resale. The claim was presented, and from that time on interest would run as damages, and the trial court could (even in an action at law) have awarded the legal rate on the amounts for which judgment was awarded the plaintiff. The appeal was properly addressed to the discretion of the court of chancery. Penn Steel Co. v. N. Y. City Ry. Co., 198 Fed. 778, 117 C. C. A. 560; Woerz v. Schumacher, 161 N. Y. 536, 56 N. E. 72. It appears that Beer, Sondheimer & Co. had agents with full authority in the United States from March 17, 1915, when they repudiated the contract, until July 12, 1918, when the custodian seized their property. Elkin and Frohnknecht were in complete charge of their American business. They had ample funds, in amount several millions. In August, 1915, Beer, Sondheimer & Co., Inc., was organized and there was transferred to this corporation the American assets of the copartnership of Beer, Sondheimer & Co. In exchange for this property, all the stock of the newly formed corporation was issued to the German firm, and the assets were about four and a half million dollars. The Alien Property Custodian, after investigation, found that this corporation was organized for the sole purpose of defeating the rights of the United States government in the event of war with Germany and that the reported transfer of stock to Elkin and Frohnknecht was fraudulent and wholly void. He thereupon seized the property. Therefore the state of war which followed between the United States and Germany could not have interfered with the transfer of property from Germany to this country so far as paying American creditors was concerned. And it further appears that between September 1, 1915, and February 3, 1917, Beer, Sondheimer & Co. in the United States transferred to Beer, Sondheimer & Co. at Frankfort,

$2,047,000. The last remittance of $700,000 was made on February 3, 1917, the day upon which the German Ambassador received his passport and left this country. Therefore it appears that even though a state of war existed between April 5, 1917, and July, 1919, there was no valid reason why Beer, Sondheimer & Co. should not be required to pay the interest on the plaintiff's demand. The demand having been presented in the form of a summons and complaint on June 29, 1916, we think interest should run on the amount allowed by the court below as damages from that date.

[10] In computing the damages, the master allowed $42,201.50 as a saving in freight. The contract with Beer, Sondheimer & Co. provided for delivery of the ore f. o. b. Bartlesville or any other point having an equal freight rate. On the resale of the ore, it was provided for delivery f. o. b. Altoona, Kan., which had the same rate as from Kennett to Bartlesville. But there was a saving in the rate for the reason that the traffic rates depended upon the actual value per ton of 2,000 pounds. The railroad company had no established market value to fix this rate and accepted the invoice price of the ore shipped. Below, it was held that the amount actually paid for transportation to Altoona was the correct basis for freight, but that if the same ore had been consigned to Beer, Sondheimer & Co. at Bartlesville, the freight rate would have been based upon the invoice price of the ore under that contract, and this amounted to a difference of $42,201.50. In point of fact, the railroad company in fixing the rate was not obliged to go beyond the invoice price of the goods as stated, and would undoubtedly have accepted the value in the invoices if the goods had been shipped under the terms of the original contract. The resale prices minimized the loss to the extent of $42,201.50, and we are of the opinion that Beer, Sondheimer & Co. are entitled to this advantage.

The decree below will be modified so as to provide for interest from June 29, 1916, and as thus modified the decree is affirmed.